# In the United States Court of Federal Claims

No. 13-145 C

(E-Filed Under Seal:  June 26, 2013)
(Reissued for Publication:  July 9, 2013)[1]

| | |
|---|---|
| THE McVEY COMPANY, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) Post-Award Bid Protest; Judgment on |
| v. | ) the Administrative Record; RCFC |
| | ) 52.1(c); Best Value Evaluation; |
| THE UNITED STATES, | ) Organizational Conflict of Interest; |
| | ) Corrective Action |
| Defendant, | ) |
| | ) |
| & | ) |
| | ) |
| FORGENTUM, INC., | ) |
| | ) |
| Defendant-Intervenor. | ) |
| | ) |

William K. Walker, Washington, DC, for plaintiff.

Melissa M. Devine, Trial Attorney, with whom were Stuart F. Delery, Acting Assistant
Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant

---

[1] The unredacted version of this Opinion was filed under seal on June 26, 2013, Docket
Number (Dkt. No.) 40.  Defendant-intervenor Forgentum, Inc. (Forgentum) filed Intervenor
Defendant's Motion to Redact Protected Information from the Public Opinion of the Court
(Forgentum's Redaction Motion or Forgentum's Redaction Mot.), Dkt. No. 42, on July 8, 2013.
See generally Forgentum's Redaction Mot.  Forgentum represents in its Redaction Motion that
"[t]he Plaintiff and Defendant concurred with the proposed redactions" attached to Forgentum's
Redaction Motion as Exhibit A.  Id. at 1; see also id. at Ex. A (proposed redactions).  Because
the court finds the requested redactions to be for good cause to protect information within the
scope of the protective order issued in this case, see Protective Order, Dkt. No. 10, at 1 (defining
"Protected information" to include "information that must be protected to safeguard the
competitive process, including source selection information, proprietary information, and
confidential information"), Forgentum's Redaction Motion is GRANTED.  Redactions in this
version of the Opinion, reissued for publication, are indicated by three consecutive asterisks
within brackets ([***]).

Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant.  <u>Kathleen K. Barksdale</u>, Assistant Regional Counsel, General Services Administration, of counsel.

<u>Matthew R. Keller</u>, Reston, VA, for defendant-intervenor.

OPINION

HEWITT, Chief Judge

This is a post-award bid protest brought by The McVey Company, Inc. (plaintiff or McVey), the incumbent contractor heretofore responsible for providing program-level help desk support for the Tier III triage and resolution functions for the TRICARE Management Activity (TRICARE), Defense Health Information Management System. <u>See</u> Compl. for Declaratory & Injunctive Relief (Complaint or Compl.), Docket Number (Dkt. No.) 1, ¶¶ 1, 5.[2]

The Defense Health Information Management System is a comprehensive health information management system for support of military service members and their families.  <u>Id.</u> ¶ 6.  The Tier III triage and resolution functions entail receiving problem

_____

[2] Plaintiff's Complaint for Declaratory and Injunctive Relief (Complaint or Compl.), Dkt. No. 1, consists of twenty-six pages containing numbered paragraphs and, on pages twenty-six and twenty-seven, a Prayer for Relief.  <u>See generally</u> Compl.  The court cites to the numbered paragraphs by paragraph number and to the Prayer for Relief by page number.

The Complaint also includes eight exhibits.  <u>See generally id.</u>  With respect to Exhibit 3, a press release announcing the award to [***] of a government contract for sustainment support related to the Armed Forces Health Longitudinal Technology Application and Composite Health Care System, <u>see id.</u> at Ex. 3 (press release), the United States (defendant or the government) has filed Defendant's Motion to Strike (defendant's Strike Motion or Def.'s Strike Mot.), Dkt. No. 20.  Defendant "requests that the Court strike Exhibit 3 to [the Complaint] . . . as well as those portions of [plaintiff's] brief that rely upon it, and refuse to consider such information."  Def.'s Strike Mot. 1.  Defendant argues that Exhibit 3 "is not part of the administrative record," <u>id.</u>, and that it is therefore not properly before the court, <u>id.</u> at 2 (citing <u>Axiom Res. Mgmt., Inc. v. United States</u> (<u>Axiom</u>), 564 F.3d 1374, 1379 (Fed. Cir. 2009) (stating that this court's review of agency contracting decisions is limited to "the administrative record already in existence" (internal quotation marks omitted))).  Defendant also states that Exhibit 3 "is duplicative of facts already in the record."  <u>Id.</u> at 3 (citing AR 323 (General Services Administration (GSA) corrective action memorandum) (describing [***]'s role as the Armed Forces Health Longitudinal Technology Application sustainment contractor)).  Because plaintiff's Exhibit 3 is not part of the Administrative Record (AR), <u>cf. Axiom</u>, 564 F.3d at 1379, and because the court need not--and does not--rely on Exhibit 3 in this Opinion, defendant's Strike Motion is GRANTED.

reports related to the use and operation of the Defense Health Information Management System, assessing their criticality and identifying appropriate remedies.  Id. ¶¶ 2, 8.

Plaintiff protests the decision of the United States (defendant or the government), acting through the General Services Administration (GSA), to award to Forgentum, Inc. (defendant-intervenor or Forgentum) a contract for Tier III triage and resolution functions.  See id. ¶ 1.  Plaintiff contends that defendant's award to defendant-intervenor was "tainted by an organizational conflict of interest, by violations of federal procurement laws and regulations, . . . and by GSA's failure to take adequate corrective action to resolve Forgentum's disqualifying Organizational Conflict of Interest, . . . notwithstanding the [Government] Accountability Office [(GAO)] recommendation that corrective action was warranted."  Id.

The parties have filed cross-motions for judgment on the administrative record. Before the court are:  plaintiff's Complaint, filed February 26, 2013; Plaintiff, The McVey Company, Inc.'s Motion for Judgment on the Administrative Record under Rule 52.1 (plaintiff's Motion or Pl.'s Mot.), Dkt. No. 16, filed March 29, 2013 with Plaintiff's Memorandum in Support of Its Motion for Judgment on the Administrative Record (plaintiff's Memorandum or Pl.'s Mem.), Dkt. No. 17; Defendant's Opposition to Plaintiff's Motion for Judgment upon the Administrative Record and Cross-Motion for Judgment upon the Administrative Record (defendant's Motion or Def.'s Mot.), Dkt. No. 23, filed April 15, 2013; Intervenor Defendant's Cross-Motion for Judgment on the Administrative Record (Forgentum's Motion or Forgentum's Mot.), Dkt. No. 21, filed April 15, 2013 with Intervenor Defendant's Memorandum in Support of Its Cross-Motion for Judgment on the Administrative Record, Dkt. No. 22; Plaintiff's Reply to Defendants' Opposition to Motion for Judgment upon the Administrative Record and Opposition to Defendants' Motion[s] for Judgment on the Administrative Record (plaintiff's Reply or Pl.'s Reply), Dkt. No. 26, filed April 26, 2013; Defendant's Reply in Support of the Motion for Judgment upon the Administrative Record and Response in Opposition to Plaintiff's Motion to Strike (defendant's Reply or Def.'s Reply), Dkt. No. 30, filed May 8, 2013; and Intervenor Defendant's Reply Brief in Support of Its Motion for Judgment on the Administrative Record (Forgentum's Reply), Dkt. No. 31, filed May 8, 2013.

The Administrative Record (AR) was filed by defendant on March, 12, 2013.[3]  See Def.'s Notice of Filing AR, Dkt. No. 15, at 1 (stating that the Administrative Record was

_____

[3] The McVey Company, Inc. (plaintiff or McVey) has filed Plaintiff's Motion to Strike (plaintiff's Strike Motion or Pl.'s Strike Mot.), Dkt. No. 27, requesting that the court strike certain parts of the Administrative Record.  See Pl.'s Strike Mot. 1.  Plaintiff argues that the documents it wishes to strike "relate to facts that were not before the GSA contracting officer at the time she awarded the contract to Forgentum, Inc.; or at the time that the [Government Accountability Office (GAO)] considered [plaintiff's] protest of the award."  Id. at 2; see also Pl.'s Reply to Defs.' Opp'n to Mot. for J. upon the AR & Opp'n to Defs.' Mot[s]. for J. on the AR (plaintiff's Reply or Pl.'s Reply), Dkt. No. 26, at 13 (characterizing documents that plaintiff

wishes to strike as "<u>post hoc</u> rationalization[s]"). In support of its request, plaintiff cites <u>Axiom</u> for the proposition that the court's review of a contracting agency's decision is limited "to 'the administrative record already in existence, not some new record made initially in the reviewing court.'" Pl.'s Strike Mot. 2 (quoting <u>Axiom</u>, 564 F.3d at 1379). Plaintiff also objects to the court's consideration of the GSA corrective action memorandum and of certain e-mails and other communications regarding the contracting officer's pre-award conflict of interest evaluation on the basis that these documents are "hearsay." <u>See</u> Pl.'s Reply 12-13. Defendant responds that the documents at issue are not, as plaintiff claims, "<u>post hoc</u> and are, instead, properly part of the administrative record." Def.'s Reply in Supp. of the Mot. for J. upon the AR & Resp. in Opp'n to Pl.'s Mot. to Strike (Def.'s Reply), Dkt. No. 30, at 18 (citing, inter alia, <u>Turner Constr. Co. v. United States</u>, 645 F.3d 1377, 1386 (Fed. Cir. 2011), <u>PlanetSpace Inc. v. United States</u>, 96 Fed. Cl. 119, 126-27 (2010)). Defendant is correct.

The documents that plaintiff wishes to strike are all related to the corrective action taken by GSA in response to plaintiff's GAO protest: internal GSA e-mails and notes discussing the contracting officer's pre-award conflict of interest analysis, a statement from Forgentum discussing its conflict of interest analysis prior to the submission of its quote (and related e-mail correspondence), past performance reviews for Forgentum and its proposed subcontractor, [***], a memorandum from GSA's information technology (IT) specialist analyzing potential conflicts of interest (collectively, the other documents), and the GSA corrective action memorandum documenting the GSA's corrective action and referencing the other documents. <u>See</u> Pl.'s Strike Mot. 1 (listing parts of the AR plaintiff wishes to strike); AR 317-28 (GSA corrective action memorandum) (documenting GSA's corrective action and noting how the information contained in the other documents was related to GSA's corrective action, for example, stating that the government reviewed past performance reviews for Forgentum and [***] and concluding that they contained nothing that would indicate a risk of bad faith conduct).

As defendant correctly states, <u>see</u> Def.'s Reply 4, the court may consider evidence that was developed during corrective action in response to prior bid protest proceedings and that reflects previously undocumented pre-award analysis, <u>see</u> <u>Turner Constr. Co.</u>, 645 F.3d at 1386 ("Courts reviewing bid protests routinely consider post-award [organizational conflict of interest] analyses and consider evidence developed in response to a bid protest."); <u>see, e.g.</u>, <u>PlanetSpace Inc.</u>, 96 Fed. Cl. 126-27 (considering a statement from the contracting agency that further explained the agency's best value tradeoff analysis--filed pursuant to the court's remand order, which found the agency's original analysis ambiguous--and finding that the statement adequately supported the agency's award); <u>Masai Techs. Corp. v. United States</u>, 79 Fed. Cl. 433, 449-50 (2007) (finding "that the contracting officer performed two thorough and comprehensive investigations and carefully documented his conclusion that no [organizational conflict of interest] existed," based on "determinations and findings made in response to [two prior] bid protests brought before the GAO").

Here, the documents that plaintiff wishes to strike were developed during corrective action by GSA in response to plaintiff's GAO protest and are properly included in the Administrative Record. <u>Cf.</u> <u>Turner Constr. Co.</u>, 645 F.3d at 1386 (stating that courts "routinely consider post-award [organizational conflict of interest] analyses and consider evidence developed in response to a bid protest"). Moreover, plaintiff's objections to the documents on

filed on CD-ROM).  The parties completed their initial briefing on May 8, 2013, and the court held oral argument on Monday, May 13, 2013 at 10:00 a.m. Eastern Daylight Time.[4]  See Order of Feb. 27, 2013, Dkt. No. 9, at 2 (scheduling briefing and oral argument).  See generally Dkt. (showing entry for oral argument).  Further to the oral argument, the parties were ordered to file supplemental briefing.  Order of May 13, 2013, Dkt. No. 33, at 1.  Accordingly, also before the court are:  plaintiff's Supplemental Memorandum:  Page Limitation, Dkt. No. 35, filed May 15, 2013; Defendant's Response to Plaintiff's Supplemental Brief (defendant's Response Brief or Def.'s Resp. Br.), Dkt. No. 36, filed May 17, 2013; and Plaintiff's Reply to Defendant's Response to Supplemental Brief (plaintiff's Reply Brief or Pl.'s Reply Br.), Dkt. No. 38, filed May 21, 2013.[5]

For the reasons stated below, plaintiff's Motion is DENIED, defendant's Motion is GRANTED and Forgentum's Motion is GRANTED.

I.      Background

        A.      The Solicitation

---

the basis that they constitute hearsay is misplaced.  A "judgment on [the] administrative record is properly understood as intending to provide for an expedited trial on the record," in which evidence is restricted to the agency record, as may be supplemented in limited circumstances.  See Bannum, Inc. v. United States, 404 F.3d 1346, 1356 (Fed. Cir. 2005); Axiom, 564 F.3d at 1379-80 (discussing limited supplementation).  Therefore, documents that are properly included in the administrative record may be considered by the court regardless of whether they would meet other evidentiary standards.  Cf. Bannum, Inc., 404 F.3d at 1356 (describing the scope of judgment on the administrative record); New Dynamics Found. v. United States, 70 Fed. Cl. 782, 796-97 (2006) (finding the plaintiff's objections to portions of the administrative record on the basis that they constituted "hearsay" to be without merit and stating that "courts generally have refused to consider collateral attacks upon the materials in administrative records based upon the post hoc application of evidence rules").  Because the documents at issue were properly included in the Administrative Record, plaintiff's Strike Motion is DENIED.

[4] The oral argument held on Monday, May 13, 2013 was recorded by the court's Electronic Digital Recording (EDR) system.  The times noted in citations to the oral argument refer to the EDR record of the oral argument.

[5] Plaintiff also filed a document docketed as a response to defendant's supplemental brief.  See generally Dkt. No. 37.  This document, an e-mail to plaintiff's counsel, appears to have been filed in error.  See generally id.  The court disregards this document and instead considers Plaintiff's Reply to Defendant's Response to Supplemental Brief, Dkt. No. 38, which appears to be the document that plaintiff intended to file in the first instance.

On August 10, 2010 GSA issued a Request for Quote associated with ITSS Order ID ID03120073 (the RFQ),[6] soliciting quotes for program-level Help Desk support for the TRICARE Defense Health Information Management System Tier III triage and resolution functions. See AR 46 (RFQ); AR 198 (GSA award memorandum) (containing summary of the acquisition). The RFQ stated that quotes would be evaluated for "best value that [met] the requirement[s], considering price and other factors" and that "technical factors [would be] considered significantly more important than price." AR 46 (RFQ); cf. id. at 48 ("Contractors are reminded that award will be made on the basis of a best value quote at a fair and reasonable price."). The two technical factors to be evaluated were "Task Understanding and Past Performance." Id. at 47. The RFQ provided that "Task Understanding [would be] more important than Past Performance, and both technical factors combined [would be] significantly more important than price." Id. Nevertheless, the RFQ explained that "price is always evaluated and price rises in importance when technical merit among the quotes becomes more equal." Id. Quotes were to be submitted in two separate documents:  Volume 1, Technical Quote, and Volume 2, Price Quote. Id.

Regarding task understanding, the first technical factor, each Volume 1 Technical Quote submission was to contain a narrative (the task understanding narrative) describing the contractor's "knowledge and understanding of the requirements outlined in the [Performance Work Statement]." Id. at 48; see also AR 63-99 (Performance Work Statement) (describing required tasks, which were divided into task management and direct support categories). The RFQ stated that the government would "evaluate how well [each] contractor's response . . . demonstrate[d] an understanding of the technical support required and . . . the degree to which [its] approach satisfie[d] the core task requirements in the [Performance Work Statement]." AR 48 (RFQ).

Regarding past performance, the second technical factor, each contractor was to describe one project that was "similar in size and scope to the current requirements" and that was performed by the contractor (as a prime contractor or subcontractor) within the past three years. Id.; see also id. at 49 (describing specific information to include in addition to narrative, such as period of performance, dollar value and contract number). The RFQ defined "Similar Technical Scope" as "demonstrated past performance that encompasses a majority of the core competencies and support services set forth in the

---

[6] The Request for Quote associated with ITSS Order ID ID0312007 (RFQ) was amended on August 14, 2012 to add the Performance Work Statement, see AR 63-99 (Performance Work Statement), as Appendix 1 and again on August 22, 2012 in response to requests for clarification, see AR 198 (GSA award memorandum) (noting amendments); see also AR 46 (amended RFQ, noting date of amendment); cf. Compl. Ex. 1 (original RFQ). The amendments in response to requests for clarification included expanding the page limit for the Technical Quote from ten pages to fourteen pages, among other changes. Compare Compl. Ex. 1 (original RFQ) 3 with AR 48 (amended RFQ). Unless otherwise noted, the court's citations to the RFQ refer to the amended RFQ provided in the Administrative Record.

[Performance Work Statement],” and stated that the government would “place greater value on demonstrated past performance that encompasses a greater range of the support services directly related to the [Performance Work Statement].” Id.  The RFQ stated that the government would “evaluate the degree of satisfaction with the overall quality, timeliness, and success of [each] contractor’s past performance,” based on the information contained in the quote as well as on additional information obtained by the government from other sources and that “[p]ast performance more relevant to the task requirements . . . [would] receive higher value.” Id.  Each Volume 1 Technical Quote submission was not to exceed fourteen double-spaced, letter-sized pages. Id. at 48.

With respect to Volume 2 Price Quote submissions, the RFQ stated that each contractor would “submit a Firm Fixed Priced type quote,” breaking out task management and direct support tasks (as described in the Performance Work Statement) and pricing each separately for a twelve-month base period and all applicable option periods. Id. at 50; see also id. at 46 (providing for a twelve-month base period, two twelve-month option periods and one two-month transition option period).  Further, each contractor was required to include in its pricing for direct support tasks for each period a sliding scale chart, adjusting prices based on the total quantity of tickets resolved. Id. at 50.  Each contractor was also required to provide a price summary sheet totaling all components of its price quote. Id.  In support of its pricing, each contractor was to provide a narrative describing “the basis for [its] monthly fixed price to include the level of effort and type of labor planned for program management and ticket resolution,” as well as “any other explanatory information [each contractor] deem[ed] necessary.” Id.

The Performance Work Statement issued as Appendix 1 to the RFQ included a section addressing organizational conflicts of interest, which stated that TRICARE “indicat[ed] and advis[ed] awareness that ‘actual’ and ‘potential’ organizational conflicts of interests . . . may exist with [TRICARE] Contractors that currently perform logistical, program, operational, [and] data management support” for TRICARE in Aurora, Colorado, Falls Church, Virginia and the Pacific Joint Information Technology Center. AR 65 (Performance Work Statement).  The Performance Work Statement provided that a contractor submitting a quote that might give rise to an actual or potential organizational conflict of interest--because the contractor intended to use a person under a subcontract or in an advisory capacity who, at the time of the submission, supported TRICARE in the specified locations--would “provide a mitigation plan to the Government that effectively demonstrate[d] how the [contractor would] mitigate any potential or actual [organizational conflict of interest] in its business arrangement for supporting this contract and any other [TRICARE] contract.” Id. at 66.  When asked whether a mitigation plan, among other items, was to be included in the page limit for the technical quote, GSA responded that “[a]ll information submitted as a part of Volume I is subject to the page limitation.” AR 106 (Questions and Answers (Q&A)); cf. AR 48-49 (RFQ) (describing Volume 1 requirements but not listing the mitigation plan).

B.      GSA's Quote Evaluation and Contract Award

Four contractors submitted quotes in response to the RFQ:  Forgentum (with [***] as subcontractor), McVey, MSGI Corporation (with [***] as subcontractor) and TechFlow, Inc. (with [***] and [***] as subcontractors).  See AR 185 (technical evaluation summary); AR 198-204 (GSA award memorandum) (noting subcontractors).

Only two of the four contractors, Forgentum (with [***]) and McVey, were determined by GSA to meet both the task understanding and past performance requirements.  See AR 185 (technical evaluation summary); AR 199 (GSA award memorandum).  Forgentum was rated "High Meets" overall; McVey was rated "Meets" overall.  AR 185 (technical evaluation summary); AR 199 (GSA award memorandum).  Forgentum submitted a substantially lower fixed price quote than McVey.  See AR 205-06 (comparing Forgentum's base level base period price of $4,575,570 with McVey's of $6,537,116 and comparing Forgentum's evaluated total price (inclusive of task management and all levels of ticket processing quoted on the sliding scales) of $80,285,145 with McVey's of $126,467,702[7]).

Based on its evaluation, GSA concluded that awarding the contract to Forgentum "represent[ed] the best value[] and result[ed] in the lowest overall cost alternative to meet the Government's requirement for [TRICARE] Tier III Help Desk Support."  AR 208 (GSA award memorandum).  GSA explained that the emphasis on price was appropriate given that "both submissions highly [met] the requirements of the Government" and that "[t]here is no higher merit in the [McVey] quote that would warrant payment of a higher price."  Id. at 209.

During the evaluation process, GSA's technical team identified and considered three potential organizational conflicts of interest related to Forgentum's use of [***] as a subcontractor.  See AR 318-21 (GSA corrective action memorandum); see also AR 310-14 (memorandum from GSA information technology (IT) specialist) (describing technical review of potential conflicts of interest).  These three potential conflicts of interest were based on:  (1) [***]'s role as provider of sustainment support (as the external software development organization) to the Armed Forces Health Longitudinal Technology Application[8] and Composite Health Care System[9] components of the

---

[7] The GSA award memorandum states that McVey failed to include a sliding scale with its transition period estimate.  AR 208 (GSA award memorandum).  GSA therefore added McVey's "transition price of $1,044,948 x 5 for levels 2, 3, 4, 5, 6," or $5,224,740.90, "to [McVey's] total of $121,242,960.83 for an evaluated total of $126,467,701.72."  Id.

[8] The Armed Forces Health Longitudinal Technology Application is a clinical information system that "provid[es] secure, 24/7 access to TRICARE beneficiaries' medical records worldwide."  AR 64 (Performance Work Statement).

Defense Health Information Management System under a separate contract (the
sustainment contract), (2) [***]'s experience as the developer of the Composite Health
Care System, and (3) [***]'s role as the prime contractor on the Armed Forces Health
Longitudinal Technology Application "Critical Fixes" contract (the critical fixes
contract). See AR 318, 320 (GSA corrective action memorandum).

As to the first potential conflict of interest, the technical team identified the risk
that, under the contract at issue, [***] "could potentially initialize tickets and then
classify them as [one of three categories] . . . [that] would require the involvement of"
[***] as a sustainment support provider under the sustainment contract--that is, that [***]
could "essentially triage tickets to itself" by incorrectly categorizing them. Id. at 318.
However, the technical team determined that this risk was "minimal" given that in 2011
only 48 of 78,000 tickets issued (or less than one half of one percent) were escalated to
[***] for resolution under the sustainment contract instead of being resolved directly by
the Tier III triage contractor. Id.; see also id. at 320 (noting that, of the "small number"
of tickets escalated for sustainment support, most did not "result in a great expenditure of
efforts or costs," and that those that "might involve more extensive efforts" were required
to "be reviewed by . . . government personnel prior to escalation"). Further, the technical
team concluded that the risk was mitigated by existing internal government controls,
including: the government's "routine review" of ticket classifications against historical
data (making any deviations or significant variations "readily apparent"); monthly status
reports to be provided by Forgentum under the Tier III triage contract (showing trouble
ticket tracking data and a subcontractor expenditure report); the TRICARE incident
management tool, Remedy (providing real time visibility into ticket statuses and issues);
and earned value management data required of [***] under the sustainment contract
(which would show an "increased burn rate" if "vast numbers of tickets were
inappropriately triaged from the Tier III task order to the sustainment contract"). Id. at
319-20.

With respect to the second potential conflict of interest, the technical team noted
that [***]'s access to Composite Health Care System development information "did not
create an unfair competitive advantage" because it did not "automatically equate to the
opportunity for a superior tier III triage process or approach." Id. at 320. According to
the evaluators, "[j]ust because [***] was involved in development in no way ensured the
Forgentum team would be able to submit a successful proposal to address how tickets
relative to that system should be managed, classified, and resolved." Id.

With respect to the third potential conflict of interest, GSA concluded that the
critical fixes contract (on which [***] was the prime contractor) did not include "ongoing

---

[9] The Composite Health Care System "enables [Department of Defense] providers to
electronically order laboratory tests, retrieve test results, authorize radiology procedures and
prescribe medications." Id.

sustainment or re-engineering support" and, therefore, that "work issued as a result of a trouble ticket classification through the Tier III task order would not be within the scope" of [***]'s critical fixes contract.  Id. at 320-21.

The technical team's analysis was discussed with the contracting officer, Debra Stuart (Ms. Stuart), on September 21, 2012.  Id. at 321-22; see also AR 288-89 (January 28, 2013 GSA e-mail chain) (confirming date of discussion).  On September 24, 2012 C. Michelle Carney, the contract specialist for the procurement, confirmed that, under the Performance Work Statement, it was the contractor's responsibility to provide a mitigation plan with its quote if an actual or potential conflict of interest existed and that Forgentum had not submitted a mitigation plan.  See AR 313 (memorandum from GSA IT specialist); AR 209 (GSA award memorandum) (identifying C. Michelle Carney as the contract specialist for the procurement).  Nevertheless, the contracting officer and contract specialist determined that, based on the technical team's analysis, "there was no evidence that a significant [organizational conflict of interest] existed and thus a mitigation plan was not needed."  AR 321 (GSA corrective action memorandum); see also AR 236-37 (contracting officer's statement) (describing contracting officer's consideration of potential conflicts of interest and stating that the contracting officer, "through the exercise of common sense, good judgment, and sound discretion made a decision that no significant potential conflict of interest existed regarding [***] as a subcontractor to Forgentum").

Accordingly, on October 11, 2012 GSA awarded the contract to Forgentum.  See AR 197 (October 15, 2012 e-mail from GSA to McVey) (providing notice of award); AR 198 (GSA award memorandum).

C.     Protest History and GSA Corrective Action

After receiving notice of the contract award, McVey requested a debriefing on the evaluation of its proposal.  See AR 212 (October 15, 2012 e-mail from McVey to GSA).  Ms. Stuart, the contracting officer, replied by e-mail, "[C]onsistent with [48 C.F.R. (FAR)] 8.405-2(d), a brief explanation of the basis for award follows, as debriefings are not conducted."  AR 213 (October 15, 2012 e-mail from Ms. Stuart to McVey); see also FAR 8.405-2(d) (2012) ("If an unsuccessful offeror requests information on an award that was based on factors other than price alone, a brief explanation of the basis for the award decision shall be provided.").  Ms. Stuart provided the following "brief explanation":  "[McVey's] quote was evaluated in accordance with the criteria identified in the RFQ and determined to meet the Government's requirements under each evaluation factor but did not merit the payment of a higher price."  AR 213 (October 15, 2012 e-mail from Ms. Stuart to McVey).

On October 19, 2012 McVey filed a post-award bid protest with GAO.  See AR 214-30 (first GAO protest and cover e-mail).  The GAO protest alleged that "the

evaluations GSA performed were flawed and in violation of the disclosed evaluation criteria" and that Forgentum was "tainted by a disqualifying organizational conflict of interest." AR 216 (first GAO protest). More specifically, McVey alleged that "GSA advertised a best value type source selection method" under which "technical factors are considered significantly more important than price" but "awarded the contract to Forgentum because it submitted a lower price." Id. at 226 (emphasis omitted). In addition, McVey alleged that Forgentum's use of [***] as a subcontractor gave Forgentum "access to non-public information . . . from which it obtained a competitive advantage,"[10] id. at 224-25; and that "GSA afforded unequal treatment" because it "overlooked the obvious and disqualifying conflict of interest that [***] has," giving Forgentum "access to programs and other information the government paid [***] for . . . that only Forgentum was allowed access to," id. at 227.

GAO held a conference call with the parties on January 14, 2013, see AR 273 (January 14, 2013 e-mail from GAO to the parties), during which it stated that the record before GAO was inadequate to assess GSA's consideration of whether Forgentum had an impermissible organizational conflict of interest, see AR 307 (second GAO decision) (stating that during the first GAO protest, GAO "was not provided copies of the quotations [GSA] received . . . [or] any documentation of how the contracting officer analyzed the potential for an [organizational conflict of interest] in this circumstance, or any indication that an investigation had been conducted or that the client agency, TRICARE Management Activity, had been consulted"). Following the conference call, on January 16, 2013, GSA submitted a memorandum to GAO stating that it planned "to take corrective action" to include "conduct[ing] an [organizational conflict of interest] investigation" and "request[ing] . . . a Mitigation Plan if deemed necessary, in order to address the areas of concern identified" in McVey's GAO protest. AR 274 (memorandum from GSA to GAO). Accordingly, GAO "dismiss[ed] the protest as academic." AR 275 (first GAO decision).

On January 18, 2013 McVey filed a second GAO protest, this time complaining that GSA's determination to take corrective action "afford[ed] Forgentum two bites at the apple" and "ignore[d] McVey's other stated grounds for protest." AR 278 (second GAO protest); see also AR 307 (second GAO decision) (describing the circumstances of McVey's second GAO protest). GAO dismissed this protest on February 1, 2013. See AR 307 (second GAO decision). GAO stated that it would not substitute its judgment for GSA's absent clear evidence that GSA's determination was unreasonable. Id. at 308. GAO further stated that "the crux of McVey's argument is that our Office should accept

---

[10] Although plaintiff raised the issue of access to non-public information in its GAO protest, plaintiff has not made such an allegation in the Complaint. As defendant correctly observes, see Def.'s Mot. 32, plaintiff has therefore waived any claim in this action based on access to non-public information, cf. Casa de Cambio Comdiv S.A., de C.V. v. United States, 291 F.3d 1356, 1366 (Fed. Cir. 2002) (concluding that the plaintiff waived any claim based on a theory not mentioned in the complaint).

the protester's allegations as fact and--based on a record that we deemed inadequate--find that Forgentum's team was ineligible to receive the task order because it had an [organizational conflict of interest] that could not be mitigated." Id.  GAO dismissed this argument as "unsupported" and stated that it "fail[ed] to state a valid basis for protest." Id.  With respect to McVey's allegation that Forgentum's quote was unacceptable because it failed to include a mitigation plan as required by the RFQ, GAO stated that "Forgentum's quotation was not provided for the record, . . . and McVey does not represent that it has seen Forgentum's quotation."  Id.  GAO also noted that the mitigation plan requirement was included in the Performance Work Statement and was not a factor for evaluation under the RFQ.  Id. at 309.  GAO described McVey's additional arguments as dependent on the same argument that Forgentum had a disqualifying conflict of interest and found them to be adequately addressed by GSA's corrective action.  See id.

Because Ms. Stuart, the contracting officer at the time the contract was awarded, left GSA prior to GSA's decision to take corrective action, the corrective action was conducted by the new contracting officer, Nancy Ballay (Ms. Ballay).  See AR 332 (February 12, 2013 e-mail from GSA to McVey) (stating that Ms. Ballay was the new contracting officer); AR 317-28 (GSA corrective action memorandum) (signed by Ms. Ballay as the contracting officer and stating that Ms. Stuart had since left GSA).  In taking corrective action, Ms. Ballay confirmed that an organizational conflict of interest analysis was conducted by GSA's technical team and discussed with Ms. Stuart and with agency counsel prior to the award to Forgentum.  See AR 288-89 (January 28, 2013 GSA e-mail chain).  Ms. Ballay also requested additional details from Ms. Stuart about her conflict of interest analysis at the time of the award.  See AR 322 (GSA corrective action memorandum); AR 282 (January 24, 2013 GSA e-mail chain) (discussing Ms. Stuart's conflict of interest analysis), and obtained a statement from Forgentum regarding its organizational conflict of interest analysis at the time its quote was submitted, see AR 292-93 (January 2013 e-mail chain between Forgentum and GSA); AR 295 (Forgentum organizational conflict of interest statement).

Ms. Ballay documented her independent organizational conflict of interest investigation in a memorandum dated February 6, 2013, in which she concluded that the risk of a conflict was "so insignificant that there [was] no need to obtain a mitigation plan from Forgentum."  AR 328 (GSA corrective action memorandum); cf. Telephonic Status Conference (TSC) of Feb. 26, 2013, at 5:54:04-07[11] (Kathleen Barksdale, GSA counsel) (stating that the GSA conflict of interest investigation concluded that a mitigation plan was unnecessary).  In support of this position, Ms. Ballay also stated in the GSA

---

[11] The Telephonic Status Conference (TSC) held by the court on February 26, 2013 was recorded by the court's EDR system.  The times noted in citations to the TSC refer to the EDR record of the TSC.

corrective action memorandum:  (1) that there "are sufficient controls in place to protect against the trivial potential risk" of [***] triaging tickets to itself under the sustainment contract and that, because [***]'s sustainment contract expires and "will be re-competed within the next 1.5 years[,] . . . [a]ny record of poor development support . . . or any record of performing in a biased manner[] would be detrimental" to [***]; (2) that [***] did not have an unfair competitive advantage because its Composite Health Care System development experience was "not directly relevant to the Forgentum[] team['s] ability to submit a successful proposal for Tier III support" and that, if any contractor had a competitive advantage, it was McVey as the incumbent; and (3) that "[t]here is absolutely no factual or reasonable basis to assume an [organizational conflict of interest] exists because of a theoretical possibility that Forgentum and [***] will collude to perform in bad faith."  AR 325-27 (GSA corrective action memorandum).

Thereafter, on February 7, 2013, GSA lifted the stay that had been place during the GAO protests.  AR 329 (February 7, 2013 e-mail from GSA to Forgentum) ("Forgentum shall now resume performance on the task order in accordance with existing task order terms and conditions.").  On February 12, 2013 McVey was informed that "GSA took action in accordance with the GAO order" and that "[p]erformance under the Forgentum task order resumed on February 7, 2013."  AR 332 (February 12, 2013 e-mail from GSA to McVey).  McVey filed this suit on February 26, 2013.  See generally Compl.  McVey seeks:  (1) a declaration that the government's evaluation of quotes and the resulting contract award to Forgentum were unlawful; (2) an order requiring GSA to award the contract to McVey; (3) a permanent injunction[12] preventing any contractor other than McVey from performing the services specified in the contract at issue; (4) attorney's fees, costs and interest; and (5) any further relief the court deems just and appropriate.  Compl. 26-27; accord Pl.'s Mem. 32-33.

II.     Legal Standards

        A.     Bid Protest Jurisdiction

The United States Court of Federal Claims (Court of Federal Claims) has "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract [by a federal agency] or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1) (2006).  As a threshold matter, a protestor must show that it has standing by meeting the

---

[12] McVey also requested a temporary restraining order and a preliminary injunction in its Complaint.  Compl. ¶¶ 146-54; see also id. at 26 (requesting "a temporary, preliminary and permanent injunction").  McVey subsequently filed a separate motion seeking immediate declaratory relief, a temporary restraining order and a preliminary injunction, see Pl.'s Emergency Mot. for Declaratory Relief, TRO, & Prelim. Inj., Dkt. No. 3, which the court denied on February 27, 2013, see Order of Feb. 27, 2013, Dkt. No. 8.

"interested party" standard, that is, by showing that it (1) is an actual or prospective bidder or offeror, and (2) has a direct economic interest in the outcome of the procurement. Rex Serv. Corp. v. United States, 448 F.3d 1305, 1307 (Fed. Cir. 2006); see also Am. Fed'n of Gov't Emps. Local 1482 v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (defining an "interested party" as an "actual or prospective bidder[] or offeror[] whose direct economic interest would be affected by the award of the contract or by failure to award the contract").  To establish that a plaintiff's "direct economic interest" is affected in the post-award bid protest context, a plaintiff "must show it would have been 'a qualified bidder,' i.e., that it had a 'substantial chance' of being awarded the contract."  Microdyne Outsourcing, Inc. v. United States (Microdyne), 72 Fed. Cl. 230, 232 (2006) (quoting Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1370-71 (Fed. Cir. 2002)); see also Brooks Range Contract Servs., Inc. v. United States (Brooks Range), 101 Fed. Cl. 699, 713 (2011) ("A finding of standing in a post-award bid-protest case requires that the protestor have a 'substantial chance' to obtain the cont[r]act if the alleged errors are found to exist.").  Stated differently, a plaintiff must show that it has been prejudiced by the alleged error in the government procurement process--that "but for the error, it would have had a substantial chance of securing the contract."  Labatt Food Serv., Inc. v. United States (Labatt Food), 577 F.3d 1375, 1378 (Fed. Cir. 2009); see also Brooks Range, 101 Fed. Cl. at 706 ("[A] protestor must demonstrate how an alleged error by the government would result in 'particularized harm' to the protestor." (quoting Labatt Food, 577 F.3d at 1380)).  Because "standing is a jurisdictional requirement, a protestor's failure to establish standing precludes a ruling on the merits."  Sci. Applications Int'l Corp. v. United States, 102 Fed. Cl. 644, 650 (2012) (internal quotation marks omitted); see also Labatt Food, 577 F.3d at 1378 ("[B]ecause the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits." (internal quotation marks omitted)).

B.      Motion for Judgment on the Administrative Record

Rule 52.1(c) of the Rules of the United States Court of Federal Claims (RCFC) provides for motions for judgment on the administrative record.  See RCFC 52.1(c)(1) (providing that "a party may move for partial or other judgment on the administrative record").  A motion for judgment on the administrative record is "distinguish[able]" from a motion for summary judgment in that there is no requirement that all material facts be undisputed.  Bannum, Inc. v. United States, 404 F.3d 1346, 1355 (Fed. Cir. 2005); see also RCFC 52.1 rules committee note (2006) ("Summary judgment standards are not pertinent to judicial review upon an administrative record.").  "The standards and criteria governing the court's review of agency decisions [on a Rule 52.1(c) motion] vary depending upon the specific law to be applied in particular cases."  RCFC 52.1 rules committee note (2006).

In the context of bid protests, the court "shall review the agency's decision pursuant to the standards set forth in section 706 of title 5" of the United States Code, that

is, under the Administrative Procedure Act standard.  28 U.S.C. § 1491(b)(4); Impresa Construzioni Geom. Domenico Garufi v. United States (Impresa), 238 F.3d 1324, 1332 (Fed. Cir. 2001); Advanced Data Concepts, Inc. v. United States (Adv. Data Concepts), 216 F.3d 1054, 1057-58 (Fed. Cir. 2000).  "A bid protest proceeds in two steps." Bannum, Inc., 404 F.3d at 1351.  The first step is to demonstrate error, that is, to show that the agency acted in an arbitrary and capricious manner, without a rational basis or contrary to law.  Id.; accord PAI Corp. v. United States, 614 F.3d 1347, 1351 (Fed. Cir. 2010); cf. 5 U.S.C. § 706(2)(A) (2006) (stating that the reviewing court shall set aside an agency decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").  The second step is to determine whether the error was prejudicial.  Bannum, Inc., 404 F.3d at 1351.

1.      The Plaintiff Must Establish Error

A government contract award may be set aside as erroneous under the arbitrary and capricious standard if "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1358 (Fed. Cir. 2009) (internal quotation marks omitted); Banknote Corp. of Am. v. United States (Banknote), 365 F.3d 1345, 1351 (Fed. Cir. 2004).

The "arbitrary or capricious standard . . . is highly deferential" and "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors."  Adv. Data Concepts, 216 F.3d at 1058; see also PAI Corp., 614 F.3d at 1351 ("[P]rocurement decisions are subject to a 'highly deferential rational basis review.'" (quoting CHE Consulting, Inc. v. United States, 552 F.3d 1351, 1354 (Fed. Cir. 2008)).  "[T]he test for reviewing courts is to determine whether the contracting agency provided a coherent and reasonable explanation for of its exercise of discretion." Impresa, 238 F.3d at 1332-33 (internal quotation marks omitted); accord Sys. Application & Techs, Inc. v. United States (Sys. Application), 100 Fed. Cl. 687, 711 (2011), aff'd, 691 F.3d 1374 (Fed. Cir. 2012).  The contracting officer's decision may be found to lack a rational basis, for example, if the agency "fail[ed] to follow the terms of its own Solicitation and select[ed] an offeror based upon different requirements than those imposed upon [another] offeror."  Hunt Bldg. Co. v. United States, 61 Fed. Cl. 243, 273 (2004).  Nevertheless, "a court will only overturn an agency's determination that an offeror's bid satisfied the material requirements of the solicitation if such a finding was arbitrary or capricious."  Blackwater Lodge & Training Ctr., Inc. v. United States (Blackwater), 86 Fed. Cl. 488, 505 (2009) (citing E.W. Bliss Co. v. United States, 77 F.3d 445, 448 (Fed. Cir. 1996)).

"If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might . . . have reached a different conclusion as to the proper administration and application of the procurement regulations."  Honeywell, Inc. v.

15

United States, 870 F.2d 644, 648 (Fed. Cir. 1989); see also L-3 Commc'ns Corp. v. United States (L-3 Corp.), 99 Fed. Cl. 283, 289 (2011) (stating that the "reviewing court is not permitted to substitute its own judgment for that of the agency, even if it would have come to a different decision than the agency"). A "disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." Impresa, 238 F.3d at 1333 (internal quotation marks omitted); accord Banknote, 365 F.3d at 1351.

A plaintiff's burden is "elevated where the solicitation contemplates award on a 'best value' basis," Blackwater, 86 Fed. Cl. at 503 (citing Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004)); see also Banknote, 365 F.3d at 1355 (discussing the particularly high level of discretion afforded a contracting officer under the best value evaluation standard), making it more difficult for a protestor of a best value award to prove that the contracting officer's decision was arbitrary and capricious, see Burroughs Corp. v. United States, 223 Ct. Cl. 53, 64, 617 F.2d 590, 597 (1980) (stating that "the greater the discretion granted to a contracting officer, the more difficult it will be to prove the decision was arbitrary and capricious"). If a protestor challenges a best value evaluation, the reviewing court "will examine the agency's evaluation to ensure that it was reasonable and consistent with the evaluation criteria and applicable statutes and regulations, since the relative merit of competing proposals is primarily a matter of administrative discretion." E.W. Bliss Co., 77 F.3d at 449 (internal quotation marks omitted); accord Galen Med. Assocs., Inc., 369 F.3d at 1330. The court is particularly deferential to the agency's technical evaluation. L-3 Commc'ns EOTech, Inc. v. United States (L-3 EOTech), 87 Fed. Cl. 656, 664 (2009); see also Fort Carson Support Servs. v. United States (Fort Carson), 71 Fed. Cl. 571, 586 (2006) ("In particular, the evaluation of proposals for their technical excellence or quality is a process that often requires the special expertise of procurement officials, and thus reviewing courts give the greatest deference possible to these determinations."). Nevertheless, in evaluating offerors' past performance in a best value consideration, "the contracting agency must treat all offerors equally," meaning that "it must evaluate offers evenhandedly against common requirements and evaluation criteria." Seattle Sec. Servs., Inc. v. United States, 45 Fed. Cl. 560, 569 (1999) (internal quotation marks omitted); cf. FAR 1.602-2 (requiring a contracting officer to "[e]nsure that contractors receive impartial, fair, and equitable treatment").

"Contracting officers are not obligated by the [Administrative Procedure Act] to provide written explanations for their actions." Impresa, 238 F.3d at 1337. Moreover, agency decisions are "entitled to a presumption of regularity." Id. at 1338. There is a "strong presumption that government officials act correctly, honestly, and in good faith when considering bids." Savantage Fin. Servs., Inc. v. United States (Savantage), 86 Fed. Cl. 700, 703 (2009), aff'd, 595 F.3d 1282 (Fed. Cir. 2010). Moreover, "[g]iven the presumption of regularity and good faith, a heavy burden rests upon [the plaintiff] to demonstrate that [an] absence of documentation reflects a failure to perform the

organizational conflict of interest review." Beta Analytics Int'l, Inc. v. United States (Beta Analytics), 61 Fed. Cl. 223, 228 (2004) (citing Impresa, 238 F.3d at 1338).

2.     The Plaintiff Must Establish Prejudice

To prevail in a bid protest, the plaintiff must demonstrate both that an error occurred and that such error was prejudicial. Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996); see Alfa Laval Separation, Inc. v. United States (Alfa Laval), 175 F.3d 1365, 1367 (Fed. Cir. 1999); see also Labatt Food, 577 F.3d at 1380 (stating that "non-prejudicial errors in a bid process do not automatically invalidate a procurement"). In a post-award bid protest, this means that the protestor "must establish . . . that there was a substantial chance it would have received the contract award but for that error." Statistica, Inc. v. Christopher, 102 F.3d 1577, 1582 (Fed. Cir. 1996); accord Bannum, 404 F.3d at 1353. Accordingly, there is no prejudice without error. See Alfa Laval, 175 F.3d at 1367.

Although the test for demonstrating prejudice at the merits stage of a protest is the same as the test for demonstrating prejudice at the standing stage, a separate prejudice determination at each stage is required. See Sys. Application & Techs., Inc. v. United States, 100 Fed. Cl. 687, 707 n.15 (2011), aff'd, 691 F.3d 1374 (Fed. Cir. 2012); cf. supra Part II.A (discussing the standard for determining prejudice at the standing stage). This is because, at the standing stage, the prejudice determination "is more properly considered as a question of potential rather than actual prejudice," to be "assessed based on the cumulative impact of the well-pled allegations of agency error (which are assumed true at this juncture of proceedings)." Tech Sys., Inc. v. United States, 98 Fed. Cl. 228, 244 (2011) (emphasis omitted); see also L-3 Corp., 99 Fed. Cl. at 289 (stating that the prejudice determination for purposes of standing "assumes all non-frivolous allegations to be true"). In contrast, at the merits stage, the court's "prejudice determination is based only on those allegations which have been proven true." L-3 Corp., 99 Fed. Cl. at 289.

C.     Organizational Conflicts of Interest

Pursuant to the Federal Acquisition Regulation, "contracting officers shall analyze planned acquisitions in order to . . . [i]dentify and evaluate potential organizational conflicts of interest as early in the acquisition process as possible." FAR 9.504(a)(1). In determining whether a significant potential conflict exists, a contracting officer must "exercise . . . common sense, good judgment, and sound discretion." FAR 9.505. Further, "[c]ontracting officers should obtain the advice of counsel and the assistance of appropriate technical specialists in evaluating potential conflicts." FAR 9.504(b). A contracting officer is required to "[a]void, neutralize, or mitigate significant potential conflicts before contract award." FAR 9.504(a)(2). The contracting officer shall not award a contract to an "apparent successful offeror" if "a conflict of interest is determined to exist that cannot be avoided or mitigated." FAR 9.504(e). "The

contracting officer's judgment need be formally documented only when a substantive issue concerning potential organizational conflict of interest exists." FAR 9.504(d); see also PAI Corp., 614 F.3d at 1353 ("[T]he contracting officer is not required to document in writing or submit for approval a plan to neutralize apparent or potential conflicts, which in her discretion and judgment are deemed not to be significant.").

The court reviews a contracting officer's organizational conflict of interest determinations under the Administrative Procedure Act arbitrary and capricious standard. Axiom Res. Mgmt., Inc. v. United States (Axiom), 564 F.3d 1374, 1381 (Fed. Cir. 2009); see supra Part II.B.1 (describing arbitrary and capricious standard). "Hard facts" and "concreteness" are necessary to show that a contracting officer's organizational conflict of interest determination lacked a rational basis under the arbitrary and capricious standard; "sufficient alignment of interests," "vague allegations," "mere suspicion and innuendo" are not enough. Turner Constr. Co. v. United States, 645 F.3d 1377, 1385 (Fed. Cir. 2011) (internal quotation marks omitted).

III.   Discussion

McVey alleges seven claims for relief. McVey's first four claims allege an error by the government in awarding the contract at issue to Forgentum: (1) improper evaluation of organizational conflict of interest with respect to Forgentum by both the contracting officer in making the award and by GSA in conjunction with the GAO protest (claim one), see Compl. ¶¶ 82-93 (citing FAR 9.504); (2) improper evaluation by GSA of Forgentum's mitigation plan (claim two), id. ¶¶ 94-103; (3) failure by GSA to treat offerors equally (claim three), id. ¶¶ 104-17; and (4) failure by GSA to follow the best value evaluation criteria stated in the RFQ (claim four), id. ¶¶ 118-43. McVey's remaining claims relate to particular relief sought by McVey. See id. ¶¶ 144-54 (seeking, respectively, declaratory judgment, a temporary restraining order and a preliminary injunction in claims five, six and seven); id. at 26-27 (requesting declaratory and injunctive relief, as well as attorney's fees, costs and interest). Because the court has already denied McVey's claim six for a temporary restraining order and claim seven for a preliminary injunction, see supra note 12, this Opinion considers only McVey's claims one through four and related requests for relief.

A.   Jurisdiction

Subject matter jurisdiction is a threshold matter that a court must determine at the outset of a case. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998); PODS, Inc. v. Porta Stor, Inc., 484 F.3d 1359, 1365 (Fed. Cir. 2007). The court finds that McVey's claims one through four, Compl. ¶¶ 82-143 (claims one through four) (based on the award of a GSA contract to Forgentum instead of to McVey, the incumbent contractor), and related requests for relief, id. ¶¶ 144-54 (claims five through seven) (seeking, respectively, declaratory judgment, a temporary restraining order and a

18

preliminary injunction); id. at 26-27 (requesting declaratory and injunctive relief, as well as attorney's fees, costs and interest), are within the scope of the court's bid protest jurisdiction because they are brought in objection to the award of a federal contract and seek relief of the type that the court is authorized to grant, cf. 28 U.S.C. § 1491(b)(1)-(2) (granting the Court of Federal Claims "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement" and authority to "award any relief that the court considers proper, including declaratory and injunctive relief").  The court also finds that McVey is an interested party with standing to bring these claims because (1) McVey was an actual offeror, and (2) McVey, as the only other offeror in addition to Forgentum determined by the government's evaluators to meet the technical requirements of the solicitation, had a substantial chance of being awarded the contract, see supra Part I.B (discussing GSA's evaluation of quotes submitted in response to the RFQ); cf. Rex Serv. Corp., 448 F.3d at 1307 (requiring that a party be an actual or potential offeror and have a direct economic interest in the outcome of the procurement to have standing); Microdyne, 72 Fed. Cl. at 232 (stating that, to have a "direct economic interest," a plaintiff "must show it would have . . . had a substantial chance of being awarded the contract" (internal quotation marks omitted)).  For the foregoing reasons, the court's jurisdiction over this case is proper.

B.      Cross-Motions for Judgment on the Administrative Record

Plaintiff argues that the Administrative Record "demonstrates that [GSA's] award decision under . . . GSA Contract No. ITSS Order ID: 1D03120073, was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law," Pl.'s Mot. 1, because it "lacked a rational basis and violated applicable regulations," Pl.'s Mem. 32, and that, accordingly, it should be set aside, id. at 1.  The government counters that "[t]he administrative record clearly supports [GSA's] decision to award the contract to Forgentum" and that "McVey's challenges to the award . . . consist primarily of unsupported and completely speculative organizational conflict of interest . . . and other allegations that should be rejected by this Court in their entirety."  Def.'s Mot. 1-2. Forgentum adds that plaintiff "has not met . . . the burden of proof necessary to overturn the [government's] decision to award the contract that is the subject of this litigation to Forgentum."  Forgentum's Mot. 1.  The court considers each of plaintiff's four claims of government error in turn.  Cf. PAI Corp., 614 F.3d at 1351 (stating that a plaintiff's first step toward prevailing in a bid protest is to demonstrate error); Bannum, Inc., 404 F.3d at 1351 (same).

1.      Claim One:  Improper Conflict of Interest Evaluation

a.      Pre-Award Conflict of Interest Evaluation

19

Plaintiff contends that Forgentum's use of [***] as a subcontractor presents an organizational conflict of interest because of [***]'s "long history of providing . . . engineering support services and software development in support of [TRICARE]." Pl.'s Mem. 22. Plaintiff suggests that Forgentum may have quoted an artificially low fixed price by colluding with [***] to "divert the trouble tickets" to [***]'s other contracts with the government, including the critical fixes and sustainment contracts. See id.; see also Compl. ¶ 111 (alleging that Forgentum was permitted "to base its price proposal on its performance of less than the ceiling number of trouble tickets specified in the RFQ"). Because the critical fixes and sustainment contracts are cost reimbursable contracts, plaintiff maintains, this would have allowed Forgentum to quote a lower fixed price, "albeit at government expense." Pl.'s Mem. 22; see also id. at 30 (stating that, "[b]y virtue of Forgentum/[***]'s performance of the cost reimbursable contracts, the government effectively [would] subsidize[] [Forgentum and [***]'s] performance" of the contract at issue and that, therefore, "Forgentum/[***]'s proposed price is unreliable to reflect the actual cost of the requirements specified" for the contract).

Plaintiff states that, "when the circumstances [of an organizational conflict of interest] are known to the agency early on in the acquisition process, the FAR mandates that the [organizational conflict of interest] risk be investigated and documented at that time." Pl.'s Reply 10 (citing FAR 9.504(d)). Plaintiff contends that Ms. Stuart's lack of contemporaneous written documentation at the time of the award violated the FAR because "GSA admit[ted] to its knowledge of substantive issues concerning potential organizational conflicts of interest early on in the acquisition process." Id. Specifically, plaintiff contends that the organizational conflict of interest provision in the Performance Work Statement evidences that "GSA acknowledged . . . the 'significant potential conflicts' that exist," see Pl.'s Mem. 23; Oral Argument of May 13, 2013, Argument of William K. Walker (Mr. Walker) at 10:15:00-03 (stating that it is plaintiff's position that the conflict of interest provision, "by itself demonstrates a finding of significance"), thereby triggering documentation requirements under the FAR, see Pl.'s Mem. 20 (alleging that, "as a matter of law," the contracting officer was required "to submit for approval . . . a written analysis of the [potential] conflict, including a recommended course of action" (citing FAR 9.506(b)). Plaintiff also contends that the GSA "technical panel recognized that [***]'s partnership with Forgentum represented some [organizational conflict of interest] risk to the government," triggering the documentation requirements. Pl.'s Reply 3 (internal quotation marks omitted) (citing, inter alia, AR 310-11 (memorandum from GSA IT specialist)). Plaintiff argues that, at the latest, "the contracting officer should have investigated the [organizational conflict of interest] risk and documented her judgment in relation to it . . . upon reviewing Forgentum's quotation." Id. at 9; see also id. at 23 ("[A] contracting officer may not simply 'ignore and not evaluate known potential [organizational conflicts of interest] prior to award.'" (citing NetStar-1 Gov't Consulting, Inc. v. United States (NetStar-1), 101 Fed. Cl. 511, 521 (2011), aff'd per curiam, 473 F. App'x 902 (Fed. Cir. 2012) (unpublished))).

Plaintiff asserts that the "Administrative Record is devoid of any documentation of a 'written analysis' . . . by the Contracting Officer" and of a "written recommendation . . . of a course of action GSA should take to avoid, neutralize, or mitigate the potential for conflicts of interest that GSA warned about in its RFQ." Pl.'s Mem. 7; see also Compl. ¶ 88 (stating that during the GAO protest, "GSA failed to produce any documentation . . . to establish that GSA considered whether an [organizational conflict of interest] existed"). Plaintiff therefore concludes that Ms. Stuart, as contracting officer, "failed to take reasonable steps to learn of the Organizational Conflict of Interest . . . and failed to []adequately analyze the circumstances surrounding the conflicting roles and responsibilities [of Forgentum and [***]]." Pl.'s Mot. 1-2; see also Compl. ¶ 85 ("[T]he Contracting Officer . . . failed to assess the extent of the [organizational conflict of interest] that existed, or evaluate whether the [organizational conflict of interest] was capable of being mitigated."). Alternatively, plaintiff argues that, "[a]ssuming the Contracting Officer did evaluate whether Forgentum had an [organizational conflict of interest]," her conclusions were arbitrary and capricious because, without a mitigation plan, they were "unsupported by any credible evidence." Pl.'s Mem. 20; see also id. at 26 ("Considering that GSA failed to obtain an [organizational conflict of interest] mitigation plan from Forgentum, . . . GSA could not have acted to ensure adequate safeguards were in place to prevent . . . potential bias and [an] unfair competitive advantage . . . .").

Defendant responds that "McVey merely emphasizes the absence of any documentation developed pre-award" and argues that the absence of such documentation fails to establish a violation because FAR 9.504 "does not require the contracting officer to document her findings if she determines that no signification [organizational conflict of interest] exists." Def.'s Mot. 31; see Oral Argument of May 13, 2013, Argument of Melissa M. Devine (Ms. Devine) at 10:20:20-48 (arguing that the lack of contemporaneous documentation "was not error . . . [because] the contracting officer is only required to formally document her [organizational conflict of interest] analysis and put that formal documentation in the record when a . . . significant issue of potential or actual [organizational conflict of interest] [exists]"). Defendant states that "GSA's run of the mill inclusion of [the conflict of interest provision in the Performance Work Statement] does not amount to a tacit admission of the existence of significant potential or actual [organizational conflicts of interest] under the FAR, nor does it amount to admission that significant potential or actual [organizational conflicts of interest] are created by Forgentum's quote . . . ." Def.'s Reply 8; see also Forgentum's Reply 7-8 (discussing same). Instead, according to defendant, Ms. Stuart (and the GSA IT specialist who conducted a technical organizational conflict of interest analysis that he discussed with Ms. Stuart prior to the award) determined that no significant conflict of interest existed based on consideration of "the history of contract performance, the substantial Government oversight, and the motivations that would keep [***] and Forgentum from colluding in bad faith," Def.'s Mot. 36, and this "contemporaneous analysis was memorialized by Ms. Ballay in corrective action," Def.'s Reply 9.

The FAR requires that, "[b]efore issuing a solicitation for a contract that may involve a significant potential conflict, the contracting officer shall recommend to the head of the contracting activity a course of action for resolving the conflict." FAR 9.504(c). This recommendation is to include a "written analysis." FAR 9.506. However, "the contracting officer is not required to document in writing or submit for approval a plan to neutralize apparent or potential conflicts, which in her discretion and judgment are deemed not to be significant." PAI Corp., 614 F.3d at 1353. Therefore, to the extent that Ms. Stuart acted within her discretion in determining that no significant conflict of interest existed, no documentation was required. Cf. id.

The court agrees with defendant that the government has not acknowledged a significant conflict of interest--and, therefore, that the documentation requirements of the FAR have not been triggered on this basis. First, with respect to the conflict of interest provision in the Performance Work Statement, the court notes that the provision states only that "'actual' and 'potential' organizational conflicts of interests . . . may exist" with respect to certain TRICARE contractors and former Department of Defense officials and employees. AR 65 (Performance Work Statement) (emphasis added). The Performance Work Statement further states that "[i]t is important to use sound business judgment and determine the significance of any conflict of interest." Id. The court finds, based on the plain language of the Performance Work Statement, that the Performance Work Statement does not evidence a determination by the contracting officer that a significant conflict of interest existed with respect to Forgentum and [***]. Instead, it points to sources that may pose actual or potential conflicts of interest and advises that "sound business judgment" is important to "determine the significance of any conflict of interest"--a determination that the plain language indicates is to be made outside of the Performance Work Statement itself. Cf. id.

Second, with respect to plaintiff's contention that the contracting officer should have conducted a conflict of interest analysis on review of Forgentum's quote, see Pl.'s Reply 9, the record supports a finding that the analysis occurred upon review of Forgentum's quote, exactly as plaintiff contends it should have, cf. AR 310 (memorandum from GSA IT specialist) (stating that Forgentum "submitted a technical quote which included . . . [***] as a subcontractor" and that, because "[***] . . . support[ed] two contracts for [TRICARE,] . . . considerations involving [***] involvement in the classification of tickets were discussed and evaluated to ensure that a potential conflict of interest did not exist"). Specifically, during its review of Forgentum's quote, "[t]he technical panel recognized that [***]'s partnership with Forgentum represented some risk to the government" because "[***] could possibly benefit from the incorrect categorization of tier III issues for resolution under [the sustainment] contract." Id. at 310-11. Accordingly, this potential "conflict was examined by the technical team to assess . . . whether or not it presented a risk for a significant [organizational conflict of interest]." Id. at 311; cf. NetStar-1, 101 Fed. Cl. at 521 (stating that a contracting officer "may not ignore and not evaluate known potential

[organizational conflicts of interest] prior to award" (internal quotation marks omitted)). However, this examination did not, as plaintiff contends, see Pl.'s Reply 3, trigger the documentation requirements under the FAR because the contracting officer concluded, based in part on the technical team's evaluation, "that there was no evidence that a significant [organizational conflict of interest] existed,"[13] AR 321 (GSA corrective action memorandum); see also AR 311 (memorandum from GSA IT specialist) (stating that "the technical team concluded the risk for a potential [organizational conflict of interest] was minimal"); cf. PAI Corp., 614 F.3d at 1353 (stating that documentation is not required when the contracting officer determines that a conflict of interest is not significant).

Further, the record does not support plaintiff's contention that Ms. Stuart, as contracting officer, "failed to assess the extent of the [organizational conflict of interest] that existed, or evaluate whether the [organizational conflict of interest] was capable of being mitigated," Compl. ¶ 85; see also Pl.'s Mot. 2 (similar), because the record contains numerous sources documenting Ms. Stuart's conflict of interest analysis in great detail, see, e.g., AR 317-21 (GSA corrective action memorandum) (summarizing Ms. Stuart's pre-award conflict of interest analysis); AR 312-13 (memorandum from GSA IT specialist) (summarizing discussions of the technical team's conflict of interest analysis with Ms. Stuart); AR 282 (January 24, 2013 GSA e-mail chain) (discussing the basis for Ms. Stuart's determination that no significant conflict of interest existed); AR 236 (contracting officer's statement) (summarizing Ms. Stuart's pre-award conflict of interest analysis).  In addition, the record shows that Ms. Stuart consulted with the contract specialist and the GSA IT specialist assigned to the procurement in making her determination that no significant conflict of interest existed, see AR 312-13 (memorandum from GSA IT specialist); that this analysis was discussed with agency counsel prior to the award to Forgentum, see AR 288-89 (January 28, 2013 GSA e-mail chain); and that Ms. Stuart's determination was based, in part, on the technical team's conclusion that "any potential risk from an [organizational conflict of interest] tied to the ability of [***] to . . . triage tickets to itself . . . was minimal," AR 318 (GSA corrective

---

[13] Plaintiff also contends that the GSA has "admit[ted] the fact of the [organizational conflict of interest] that taints Forgentum, and thereby the necessity under FAR []9.504 that the Contracting Officer 'formally document' her judgment, Pl.'s Reply 13, based on defendant's statement that the technical team concluded that no significant conflict of interest existed, in part, on the basis that routine government controls would mitigate the risk of any conflict of interest issues post-award, see Def.'s Mot. 13; AR 311 (memorandum from GSA IT specialist) (summarizing the technical team's evaluation).  Plaintiff's contention is unsupported.  The fact that the technical team concluded that any risk of post-award conflicts could be mitigated by existing controls does not evidence a determination that a significant organizational conflict of interest existed.  Cf. PAI Corp. v. United States, 614 F.3d 1347, 1353 (Fed. Cir. 2010) ("[T]he contracting officer is not required to document in writing or submit for approval a plan to neutralize apparent or potential conflicts, which in her discretion and judgment are deemed not to be significant.").  Further, it is not the technical team but the contracting officer to whose discretion the determination is committed.  Cf. id.

action memorandum); cf. FAR 9.504(b) ("Contracting officers should obtain the advice of counsel and the assistance of appropriate technical specialists in evaluating potential conflicts."). Moreover, the record shows that Ms. Stuart was briefed on the technical team's identification of existing government controls that would allow for the recognition and mitigation of any future activities suggesting an actual organizational conflict of interest. See AR 319-20 (GSA corrective action memorandum); cf. FAR 9.504(a)(2) (requiring a contracting officer to "[a]void, neutralize, or mitigate significant potential conflicts before contract award").

Plaintiff is correct that the documentation of Ms. Stuart's conflict of interest analysis in the record was created during bid protest proceedings after the award. See, e.g., Pl.'s Mem. 6; Pl.'s Reply 4 (characterizing the documentation as "post hoc rationalization"). However, far from ignoring post-award analyses, "[c]ourts reviewing bid protests routinely consider post-award [organizational conflict of interest] analyses and consider evidence developed in response to a bid protest." Turner Constr. Co., 645 F.3d at 1386; see, e.g., Masai Techs. Corp. v. United States, 79 Fed. Cl. 433, 449-50 (2007) (finding "that the contracting officer performed two thorough and comprehensive investigations and carefully documented his conclusion that no [organizational conflict of interest] existed," based on "determinations and findings made in response to [two prior] bid protests brought before the GAO"). Plaintiff's reliance on NetStar-1 in support of the proposition that documentation must be contemporaneous is misplaced. See Oral Argument of May 13, 2013, Argument of Mr. Walker at 10:07:31-:08:11 (identifying NetStar-1 as authority for the proposition and referencing notes 17-18, in particular[14]); Pl.'s Mot. 23-24 (discussing NetStar-1 and GAO decisions as supporting its assertion that the contracting officer did not perform the organizational conflict of interest evaluation tasks required by the FAR).

NetStar-1 recognizes "that an agency's failure to adhere to the FAR's requirements regarding [organizational conflicts of interest] may [not] be remedied by the expediency of obtaining post hoc declarations from the winning contractor denying any wrongdoing." NetStar-1, 101 Fed. Cl. at 526. Here, however, there is no evidence that GSA failed to adhere to the FAR documentation requirements. The fact that the corrective action taken by Ms. Ballay included obtaining a statement from Forgentum, see AR 295 (Forgentum organizational conflict of interest statement), should not obscure the fact that the documentation of Ms. Stuart's pre-award conflict of interest analysis consists not of "post hoc declarations from the winning contractor denying any

_____

[14] Plaintiff appears to refer to the portion of NetStar-1 Government Consulting, Inc. v. United States (NetStar-1), 101 Fed. Cl. 511 (2011), aff'd per curiam, 473 F. App'x 902 (Fed. Cir. 2012) (unpublished)), associated with West headnotes 17-18, as distinguished from footnotes 17-18. Compare Oral Argument of May 13, 2013, Argument of William K. Walker at 10:10:14-:56 (quoting the relevant portions of NetStar-1), with NetStar-1, 101 Fed. Cl. at 526 (matching the language quoted by plaintiff and linked to West headnotes 17-18).

wrongdoing," but of statements--made by Ms. Stuart and others involved in Ms. Stuart's pre-award analysis--documenting that analysis in response to bid protest proceedings, see id.; cf. Turner Constr. Co., 645 F.3d at 1386; Masai Techs. Corp., 79 Fed. Cl. at 449-50. This documentation directly refutes plaintiff's argument that "[d]efendant offers no facts provided by GSA officials with first-hand knowledge who contemporaneously considered whether or not Forgentum is tainted by an organizational conflict of interest." Cf. Pl.'s Reply 17. And even if this documentation had not been created, plaintiff has failed to introduce any evidence sufficient to overcome "the presumption of regularity and good faith" respecting the contracting officer's organizational conflict of interest review. Cf. Beta Analytics, 61 Fed. Cl. at 228.

Additionally, plaintiff's argument that any conflict of interest evaluation conducted by Ms. Stuart was necessarily arbitrary and capricious in the absence of a mitigation plan from Forgentum, see Pl.'s Mem. 20, 26, is without merit. To the contrary, the record supports a finding that, notwithstanding the lack of a mitigation plan, Ms. Stuart was able to conduct a meaningful conflict of interest evaluation based on available information. See AR 321 (GSA corrective action memorandum) (stating that Ms. Stuart was briefed on the detailed technical evaluation of potential conflicts of interest regarding Forgentum and [***]); AR 282 (January 24, 2013 GSA e-mail chain) (discussing the basis for Ms. Stuart's determination that no significant conflict of interest existed); AR 236 (contracting officer's statement) (summarizing Ms. Stuart's pre-award conflict of interest analysis); see also AR 310-14 (memorandum from GSA IT specialist) (in response to the GAO protests, summarizing the technical team's pre-award conflict of interest analysis and the potential for mitigation of future conflicts by existing government controls); cf. Impresa, 238 F.3d at 1332-33 (requiring under the arbitrary and capricious standard that a contracting officer's exercise of discretion have only "a coherent and reasonable explanation" (internal quotation marks omitted)); Sys. Application, 100 Fed. Cl. at 711 (same). The court considers GSA's mitigation plan evaluation below in Part III.B.2.

Based on the foregoing, the court concludes that the record provides "a coherent and reasonable explanation" for Ms. Stuart's exercise of discretion in determining that no significant conflict of interest existed, cf. Impresa, 238 F.3d at 1332-33 (internal quotation marks omitted); Sys. Application, 100 Fed. Cl. at 711 (same), and that, therefore, no documentation was required, cf. PAI Corp., 614 F.3d at 1353.

   b.    GSA Corrective Action:  No Prejudice to Plaintiff

Even if Ms. Stuart had erred in her conflict of interest evaluation, to prevail, plaintiff "must establish [prejudice, that is,] . . . that there was a substantial chance it would have received the contract award but for that error." See Statistica, Inc., 102 F.3d at 1582; see also Bannum, Inc., 404 F.3d at 1353 (stating that a plaintiff's second step toward prevailing in a bid protest is to demonstrate prejudice). In making its prejudice

determination, the court will only consider "those allegations which have been proven true." L-3 Corp., 99 Fed. Cl. at 289. "Hard facts" and "concreteness" are necessary to show that a contracting officer's organizational conflict of interest determination lacked a rational basis under the arbitrary and capricious standard; "sufficient alignment of interests," "vague allegations," "mere suspicion and innuendo" are not enough. Turner Constr. Co., 645 F.3d at 1385 (internal quotation marks omitted).

Defendant argues that plaintiff suffered no prejudice: "Ms. Ballay's independent [organizational conflict of interest] investigation [following the GAO protest] 'cleared the air of any alleged [organizational conflict of interest] taint by showing that no significant [organizational conflict of interest] existed.'" Def.'s Mot. 27 (quoting Turner Constr. Co., 645 F.3d at 1386 (alterations in original omitted)). In support of this position, defendant states that, in the GSA corrective action memorandum, Ms. Ballay "more than adequately documented her [organizational conflict of interest] analysis." Id. at 3. Specifically, according to defendant, Ms. Ballay recorded her finding that any potential conflicts of interest were minimal and extremely unlikely to occur given government control mechanisms and surveillance routines, which she described in detail. Id. at 33-34 (citing AR 326-28 (GSA corrective action memorandum)). Further, defendant asserts that Ms. Ballay did not defer to Forgentum in its organizational conflict of interest analysis, as plaintiff alleges, see Pl.'s Mem. 24 (alleging that Ms. Ballay "deferred to Forgentum" and "readily accepted Forgentum's explanation," which plaintiff contends was "unacceptable" under NetStar-1), because she, like Ms. Stuart, "considered the history of contract performance, the substantial Government oversight, and the motivations that would keep [***] and Forgentum from colluding in bad faith," Def.'s Mot. 35-36; see also Forgentum's Reply 13 (observing that FAR 9.504(e) requires a contracting officer, "[b]efore determining to withhold award based on conflict of interest considerations, . . . [to] notify the contractor, provide the reasons therefor, and allow the contractor a reasonable opportunity to respond"). Plaintiff characterizes GSA's corrective action memorandum, documenting Ms. Ballay's independent organizational conflict of interest investigation, as a "post hoc rationalization of a second Contracting Officer who had nothing to do with the acquisition." Pl.'s Mem. 6; see also Pl.'s Reply 4 (similar).

The court agrees with defendant that, even if Ms. Stuart had erred in her conflict of interest evaluation, plaintiff has failed to prove--based on "[h]ard facts" and "concreteness," cf. Turner Constr. Co., 645 F.3d at 1385 (internal quotation marks omitted); see also L-3 Corp., 99 Fed. Cl. at 289 (stating that, in making its prejudice determination on the merits, the court will only consider "those allegations which have been proven true")--that it had a "substantial chance" of receiving the contract but for such an error, Statistica, Inc., 102 F.3d at 1582.

The independent conflict of interest investigation conducted by Ms. Ballay consisted of: asking members of the acquisition team to recount their pre-award

organizational conflict of interest analysis; obtaining and reviewing documentation of the technical team's pre-award organizational conflict of interest analysis; reviewing Ms. Stuart's contracting officer's statement in response to the first GAO protest; gaining understanding of Ms. Stuart's pre-award analysis based on e-mail correspondence and conversations; and considering additional information requested from TRICARE and Forgentum. See AR 321-22 (GSA corrective action memorandum) (describing scope of Ms. Ballay's independent conflict of interest investigation). The GSA corrective action memorandum discusses the information considered by Ms. Ballay as a result of her investigation in great detail, as well as the bases for her conclusions, see id. at 322-28, and makes clear that Ms. Ballay's consideration of an organizational conflict of interest statement from Forgentum was not the only basis for her conclusions, see, e.g., id. at 326-27 (concluding, on the basis of information obtained from Forgentum, GSA and TRICARE, that "significant controls" and "Government surveillance practices" were built into the contract to protect against conflicts of interest and citing both the Forgentum organizational conflict of interest statement and positive past performance reviews in support of her determination that there was no factual support for a finding that "Forgentum and [***] will collude to perform in bad faith"). Therefore, plaintiff's assertion that Ms. Ballay "readily accepted Forgentum's explanation" and "deferred to Forgentum" is without support. Cf. Turner Constr. Co., 645 F.3d at 1385 (stating that "sufficient alignment of interests," "vague allegations," "mere suspicion and innuendo" are not enough to show that a contracting officer's organizational conflict of interest determination lacked a rational basis (internal quotation marks omitted)). In addition, NetStar-1 does not prohibit Ms. Ballay from taking the Forgentum organizational conflict of interest statement into consideration; instead NetStar-1 simply instructs that a winning contractor's post hoc declarations alone do not remedy a failure to comply with the FAR. Cf. NetStar-1, 101 Fed. Cl. at 526 (recognizing "that an agency's failure to adhere to the FAR's requirements regarding [organizational conflicts of interest] may [not] be remedied by the expediency of obtaining post hoc declarations from the winning contractor denying any wrongdoing"). Here, there is no evidence that GSA failed to comply with FAR requirements, see supra Part III.B.1.a, and even if Ms. Stuart had erred, Ms. Ballay's independent conflict of interest investigation, based on a number of sources, "clear[ed] the air of any [organizational conflict of interest] taint by showing that no significant [organizational conflict of interest] existed," cf. Turner Constr. Co., 645 F.3d at 1386.

The court therefore concludes that the record provides "a coherent and reasonable explanation" for Ms. Ballay's exercise of discretion in determining that no significant conflict of interest existed. Cf. Impresa, 238 F.3d at 1332-33 (internal quotation marks omitted); Sys. Application, 100 Fed. Cl. at 711 (same). The court further concludes that, because Ms. Ballay's independent conflict of interest investigation left undisturbed the award to Forgentum, see AR at 325 (GSA corrective action memorandum) (recording Ms. Ballay's determination that Forgentum did not have a "significant" conflict of interest "that would render it ineligible for . . . award"), plaintiff cannot establish that

"there was a substantial chance it would have received the contract award but for [any alleged] error" by Ms. Stuart, cf. Statistica, Inc., 102 F.3d at 1582.

    2.    Claim Two:  Improper Mitigation Plan Evaluation

    Plaintiff asserts that "GSA's requirement that Forgentum submit [a mitigation] plan was absolute by virtue of the support it and [***] provide to [TRICARE] under other contracts." Pl.'s Mem. 26; see also Pl.'s Reply 1 (similar).  Plaintiff contends that, therefore, "Forgentum's [quote] was nonresponsive and the Contracting Officer should have eliminated it from award consideration."[15]  Pl.'s Mem. 5; see also Pl.'s Reply 3 (similar); Compl. ¶ 100 ("Despite Forgentum's failure to comply with GSA's proposal instructions, and its submission of a nonresponsive proposal for its failure to provide a mitigation plan, GSA unlawfully evaluated Forgentum's proposal and selected it for contract award.").

    Defendant responds that "McVey's assertions . . . would require the Court to interpret the RFQ in a nonsensical way, that is, to require a mitigation plan to be

_____

    [15] Plaintiff also argued in its Complaint that the contracting officer "permit[ted] Forgentum to submit a mitigation plan after the time for receipt of proposals." Compl. ¶ 91; see also id. ¶¶ 90, 92, 101-02, 109 (referencing a late-submitted mitigation plan from Forgentum). But see TSC of Feb. 26, 2013, at 5:54:04-07 (Kathleen Barksdale, GSA counsel) (stating that no mitigation plan was ever deemed necessary).  Plaintiff appears to revise this argument in its Reply, characterizing the organizational conflict of interest statement provided by Forgentum in response to Ms. Ballay's independent conflict of interest evaluation as a late-submitted mitigation plan.  See Pl.'s Reply 11-12 ("Ms. Ballay did request and receive documentation from Forgentum regarding the analysis with respect to Organizational Conflict of Interest," and GSA's decision to "characterize the documentation requested as something other than a mitigation plan[] does not change the fact that the documentation GSA requested and received is exactly the type of information Forgentum was required to submit with its quotation in a document labeled 'mitigation plan.'" (some internal quotation marks omitted)).  Plaintiff argues that, therefore, "GSA did in fact afford Forgentum 'two bites at the apple' to submit a responsive proposal." Id. at 12.  Defendant responds that "Forgentum's submission to the GSA could hardly be described as a 'mitigation plan,' [because] it does not explain how it will 'mitigate' any [organizational conflict of interest]."  Def.'s Reply 10.

    Notably, GSA did not treat Forgentum's statement as a mitigation plan and did not consider the statement necessary to Forgentum's quote being responsive.  See AR 313 (memorandum from GSA IT specialist) ("[C]onversations between the Contract specialist and GSA legal counsel on 9/24/12 confirmed that the Mitigation plan was not needed pre-award); AR 328 (GSA corrective action memorandum) ("[T]he risk of an [organizational conflict of interest] under this [contract] is so insignificant that there is no need to obtain a mitigation plan from Forgentum.").  Accordingly, plaintiff's argument that "GSA . . . afford[ed] Forgentum 'two bites at the apple' to submit a responsive proposal," Pl.'s Reply 12, is addressed to a non-existent "requirement."

submitted by Forgentum when there is no [organizational conflict of interest] to mitigate." Def.'s Mot. 2; see also Def.'s Reply 6 (similar); Oral Argument of May 13, 2013, Argument of Ms. Devine at 10:26:02-39 (stating that Forgentum did not provide a mitigation plan because to do so would "pose[] a sort of metaphysical problem, that if . . . a quote would perhaps fall under [the requirement for a mitigation plan contained in the] performance work statement and there is no [organizational conflict of interest] that was presented by the . . . quote, to present a mitigation plan without any [conflict] to mitigate, . . . it's a difficult . . . requirement to comply with").

Defendant further contends that, because there is no conflict of interest to mitigate, the mitigation plan was not a material requirement. Def.'s Reply 6; see also Oral Argument of May 13, 2013, Argument of Ms. Devine at 10:26:40-55 (arguing that a mitigation plan that did not mitigate any conflict of interest would not have any effect on the technical evaluation or price quote and would therefore not be material). Forgentum adds, without elaboration, that no mitigation plan was required because it "did not propose to use any '[TRICARE] Contractors that currently perform logistical, program, operational, [or] data management support for'" the TRICARE locations listed in the Performance Work Statement conflict of interest provision. Forgentum's Reply 10 (quoting AR 65 (Performance Work Statement)). Forgentum also argues that there is no requirement for a mitigation plan in the RFQ and that, if there were, "[McVey] would be ineligible itself because it proposed personnel who support [TRICARE] but it did not submit [a] . . . mitigation plan." Id. at 9.

The Performance Work Statement provided that TRICARE "indicat[ed] and advis[ed] awareness that 'actual' and 'potential' organizational conflicts of interests . . . may exist with [TRICARE] Contractors that currently perform logistical, program, operational, [and] data management support" for TRICARE in Aurora, Colorado, Falls Church, Virginia and the Pacific Joint Information Technology Center. AR 65 (Performance Work Statement). The Performance Work Statement further provided that a contractor submitting a quote that might give rise to an actual or potential organizational conflict of interest--because the contractor intended to use a person under a subcontract or in an advisory capacity who, at the time of the submission, supported TRICARE --"shall provide a mitigation plan to the Government that effectively demonstrate[d] how the [contractor would] mitigate any potential or actual [organizational conflict of interest] in its business arrangement for supporting this contract and any other [TRICARE] contract." Id. at 66 (emphasis added).

In its technical quote, Forgentum listed the sustainment contract as an example of past performance. See AR 160-61 (Forgentum Vol. 1 Technical Quote). The information provided by Forgentum in its Volume 1 Technical Quote identifies the sustainment contract as a TRICARE maintenance and sustainment support contract that appears to be based in Falls Church, VA. See id. (listing TRICARE references located in Falls Church, VA). Further, Forgentum describes its TRICARE experience, along with

that of [***], as including work "to design, build, modify, enhance, operate, train, maintain, and sustain" the Composite Health Care System and Armed Forces Health Longitudinal Technology Application. Id. at 160. The court understands this to bring Forgentum's quote within the scope of the "actual" or "potential" conflicts of interest described in the Performance Work Statement. Cf. AR 65 (Performance Work Statement). Accordingly, it appears to the court that Forgentum was required to submit a mitigation plan. Cf. id. at 66 (stating that any offeror that "intends to use any Contractor employee that currently supports [TRICARE] . . . as a subcontractor or any any advisory capacity . . . shall provide a mitigation plan"); AR 46 (RFQ) (stating that all offerors should "be certain to present . . . [their] most advantageous price quote that clearly meets all technical requirements of the [Performance Work Statement] and complies completely with all quote submittal requirements" (emphasis added)).

However, the RFQ makes no mention of the mitigation plan requirement. See AR 47 (RFQ) (stating only that quotes would be evaluated "on the basis of two technical factors, Task Understanding and Past Performance, as well as price"). It appears, therefore, that the mitigation plan requirement was not part of the evaluation under the RFQ but was instead intended to aid the contracting officer in determining whether an impermissible organizational conflict of interest existed. Cf. Pl.'s Reply 19 ("To permit the contracting officer to assess the [organizational conflict of interest] risk anticipated by [the conflict of interest provision in the Performance Work Statement], GSA instructed prospective bidders to submit a mitigation plan with their quotations . . . if they intended" to use certain subcontractors that supported TRICARE.). Therefore, the question for the court in determining whether Forgentum's proposal should have been rejected from consideration is whether the mitigation plan was a material requirement. Cf. Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009) ("To be acceptable, a proposal must represent an offer to provide the exact thing called for in the request for proposals, so that acceptance of the proposal will bind the contractor in accordance with the material terms and conditions of the request for proposals."). Defendant argues that the inclusion of a mitigation plan was not a material requirement because, when "Forgentum's quote posed no [organizational conflict of interest], . . . there was nothing in a mitigation plan that would otherwise alter that quote." Def.'s Reply 6.

"A solicitation term is material where it has more than a negligible impact on the price, quantity, quality, or delivery of the subject of the bid." Blackwater, 86 Fed. Cl. at 505 (citing Centech Grp., Inc., 554 F.3d at 1038). The court will not overturn an agency's determination that an offeror "satisfied the material requirements of the solicitation" unless it concludes that the determination was arbitrary and capricious. Cf. id.

Here, despite the lack of a mitigation plan, GSA's technical evaluation team was able to identify and analyze potential conflicts of interest related to (1) [***]'s role under the sustainment contract; (2) [***]'s role as the developer of the Composite Health Care

System; and (3) [***]'s role under the critical fixes contract.  See supra Part I.B.  The contracting officer, Ms. Stuart, was briefed on the detailed technical evaluation of potential conflicts of interest regarding Forgentum and [***], see AR 321 (GSA corrective action memorandum), and, during the corrective action, this technical evaluation was summarized in writing by the GSA IT specialist assigned to the procurement, see AR 310-14 (memorandum from GSA IT specialist), and relied upon by the new contracting officer, Ms. Ballay, during her post-award organizational conflict of interest investigation, see AR 318-21 (GSA corrective action memorandum).  The record, therefore, supports a finding that GSA was able to conduct a meaningful conflict of interest evaluation without a mitigation plan from Forgentum.  Further, because the conflict of interest investigations conducted by Ms. Stuart and Ms. Ballay rationally concluded that any potential organizational conflict of interest involving [***] was not significant and was effectively mitigated by existing government controls, see supra Part III.B.1, the omitted mitigation plan cannot be said to have "ha[d] more than a negligible impact on the price, quantity, quality, or delivery of the subject of the bid," cf. Blackwater, 86 Fed. Cl. at 505, when no further mitigating action was required.  The court therefore concludes that GSA did not act arbitrarily or capriciously by considering Forgentum's bid.  Cf. Centech Grp., Inc., 554 F.3d at 1037; Blackwater, 86 Fed. Cl. at 505.

> 3.      Claim Three:  Failure to Treat All Offerors Equally

> a.      With Respect to the Mitigation Plan Requirement

Plaintiff contends that "GSA waived its requirement for a mitigation plan; but only for the benefit of Forgentum," Pl.'s Mem. 7, and asserts that this "establishes the unequal treatment . . . that McVey complains about," id. at 27; see also Pl.'s Reply 5, 21 (similar). Defendant argues that, "to the extent a mitigation plan would otherwise be required" under the Performance Work Statement, "GSA reasonably waived the mitigation plan requirement as to Forgentum, because that requirement was not material to Forgentum's quote."  Def.'s Mot. 24.

The court agrees with defendant.  The FAR requires a contracting officer to "[e]nsure that contractors receive impartial, fair, and equitable treatment."  FAR 1.602-2(b); see, e.g., Seattle Sec. Servs., Inc., 45 Fed. Cl. at 569  (stating that, with respect to evaluation of offerors' past performance in a best value procurement, "the contracting agency must treat all offerors equally," meaning that "it must evaluate offers evenhandedly against common requirements and evaluation criteria" (internal quotation marks omitted)).  However, the FAR also allows contracting officers "wide latitude to exercise business judgment."  FAR 1.602-2.  The court has found that both Ms. Stuart and Ms. Ballay acted within their discretion in determining that a mitigation plan was not a material requirement with respect to Forgentum's quote, see supra Part III.B.2 (discussing materiality of the mitigation plan requirement with respect to Forgentum's

quote); cf. FAR 1.602-2.  Further, the court cannot conclude that either Ms. Stuart or Ms. Ballay treated the offerors partially, unfairly or inequitably by waiving this requirement when each contracting officer rationally concluded that Forgentum did not present a conflict requiring mitigating action, see supra Part III.B.1 (discussing the contracting officers' conflict of interest analyses), and the mitigation plan was not a factor for evaluation under the RFQ, see supra Part III.B.2 (discussing evaluation factors); cf. Blackwater, 86 Fed. Cl. at 505 (stating that the court will not overturn an agency's determination of materiality unless it concludes that the determination was arbitrary and capricious).

Plaintiff further contends that, by waiving the mitigation plan requirement for Forgentum, "GSA unfairly increased the number of pages Forgentum was . . . allowed for its technical quote," so that "only Forgentum/[***] was allowed to effectively exceed the 14[-]page limit."  Pl.'s Mem. 27; see also id. at 16 (alleging that, "[b]y virtue of [Forgentum's] noncompliance with the RFQ requirement to submit . . . [a] mitigation plan, Forgentum actually increased the number of pages it had available to enhance its technical quotation").  Plaintiff appears to base its argument that the mitigation plan was subject to the page limit on the Volume 1 Technical Quote on language in the RFQ, see Pl.'s Reply Br. 2 (quoting RFQ language), which provided that, with respect to the task understanding portion of the Volume 1 Technical Quote, the offeror was to "[d]escribe [its] knowledge and understanding of the requirements outlined in the [Performance Work Statement]," AR 48 (RFQ).  Plaintiff argues that, because the mitigation plan requirement was contained in the Performance Work Statement, it was therefore required to be included in the Volume 1 Technical Quote.  Pl.'s Reply Br. 2.

Defendant responds that "[t]he mitigation plan was not subject to the 14-page limit and, instead, was to be submitted separately in conjunction with its technical and price quotes."  Def.'s Resp. Br. 2; see also Def.'s Mot. 26 (stating that "nothing in the record demonstrates that the mitigation plan was to be included as part of the technical quote"). In particular, defendant points to the statement in the Performance Work Statement "that '[t]he mitigation plan shall be forwarded to the Contracting Officer with the Offeror's proposal[,]' not as a part of the offeror's proposal."  Def.'s Resp. Br. 3 (quoting AR 66 (Performance Work Statement)).  Further, defendant argues that, even if the mitigation plan were subject to the page limit, because "GSA did not in fact ask Forgentum to supplement or otherwise alter its quote after the fact," McVey has not shown unequal treatment by GSA.  Def.'s Mot. 26; see also Def.'s Resp. Br. 5 (stating that, "[e]ven assuming . . . that the mitigation plan were required to be included in the technical quote, this fact is irrelevant because McVey has not suffered cognizable prejudice" when there was room in Forgentum's quote for "a short 'mitigation plan' sentence").

In addition, both parties invoke Q&A exchange eight in support of their respective positions.  Exchange eight appears in full below:

> Q8.    Are the [organizational conflict of interest] mitigation plan (if needed), the Past Performance and References, [quality control plan], and [program management plan] to be included in the [fourteen] page limit of the Technical Quote?  Please clarify.
>
> A8.    All information submitted as a part of Volume I is subject to the page limitation.  Also see revised RFQ document.

AR 106 (Q&A).  Plaintiff characterizes the Q&A exchange as follows:  "GSA responded to [Forgentum's] Q&A and expressly told Forgentum that offerors' mitigation plans were to be submitted as part of their technical quotations subject to the 14[-]page limit."  Pl.'s Reply Br. 3-4; see also id. at 3 ("Obviously, if GSA intended to permit offerors to submit . . . Mitigation Plans separate from their technical quotations, and outside of the 14-page limit, it would have stated this in the RFQ, and in the response it provided to Forgentum's Q&A.").  Defendant characterizes GSA's response in the Q&A exchange as an "expla[nation] that only the requirements outlined in the RFQ technical quote were subject to the 14-page limit.[16]  Def.'s Resp. Br. 3 (citing AR 106 (Q&A)); see also id. at 4 (asserting that defendant's interpretation "makes sense" because a requirement that the mitigation plan be included in the page limit "would create a significant unfair advantage for [offerors] whose proposals do not create" a conflict).  The court agrees with defendant that the plain language of GSA's response in the Q&A exchange indicates only that information required to be included as part of the Volume 1 Technical Quote would be subject to the page limitation, without commenting on whether that included the mitigation plan.  Cf. AR 106 (Q&A).  Moreover, the court notes that plaintiff's assertion that "GSA . . . expressly told Forgentum that offerors' mitigation plans were to be submitted as part of their technical quotations subject to the 14[-]page limit," Pl.'s Reply Br. 3-4, is a misrepresentation.  GSA simply stated that "[a]ll information submitted as a part of Volume I is subject to the page limitation."  AR 106 (Q&A).  The issue, therefore, is whether the mitigation plan was to be included in the Volume 1 Technical Quote.  For the following reasons, the court concludes that it was not.

First, as defendant correctly notes, the plain language of the mitigation plan requirement in the Performance Work Statement indicates that the mitigation plan was to

---

[16] Defendant also asserts that, "[t]o the extent McVey had further questions [about the page limit as a result of the Q&A], it was required to raise them before the award."  Def.'s Resp. to Pl.'s Supplemental Br., Dkt. No. 36, at 4 (citing Blue & Gold Fleet, L.P. v. United States (Blue & Gold), 492 F.3d 1308, 1313 (Fed. Cir. 2007)).  Indeed, if plaintiff considered the terms of the RFQ to be an issue, plaintiff should have raised any such objections prior to the close of bidding.  Cf. Blue & Gold, 492 F.3d at 1313 ("[A] party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the [United States] Court of Federal Claims.").

be submitted in addition to an offeror's proposal, as distinguished from being submitted in either the Volume 1 Technical Quote or Volume 2 Price Quote.  Cf. AR 66 (Performance Work Statement) ("The mitigation plan shall be forwarded to the Contracting Officer with the Offeror's proposal." (emphasis added)); AR 47 (RFQ) (stating that each "quote submission shall be broken into two separate documents: Volume 1 - Technical Quote and Volume 2 - Price Quote" (emphasis omitted)).

Next, as defendant also notes, the language cited by plaintiff in the RFQ, requiring an offeror to "describe [its] knowledge and understanding of the requirements outlined in the [Performance Work Statement]," appears, in context, to be limited only to those specific requirements in the Performance Work Statement related to task understanding.  Cf. AR 48 (RFQ).  Significantly, the language cited by plaintiff appears in the RFQ's description of Volume 1 Technical Quote Requirements under the heading "Task Understanding" and relates to the requirements each offeror is instructed to address in its "narrative for Task Understanding."  See id.  The Performance Work Statement contains a "description of required tasks," see AR 67 (Performance Work Statement) (capitalization and emphasis omitted), broken down into task management and direct support categories, see id. at 67-73.  It follows that the directive cited by plaintiff in the RFQ--under the heading "Task Understanding," see AR 48 (RFQ), should be interpreted to mean that the offeror should describe its knowledge and understanding of the "required tasks," specifically, in its task understanding narrative, cf. AR 67-73 (Performance Work Statement) (listing "required tasks"), as distinguished from describing in its task understanding narrative its knowledge and understanding of any and all requirements contained in the Performance Work Statement, cf. AR 48 (RFQ) (stating under the "Task Understanding" heading that an offeror's task understanding narrative "shall be evidence of the quoter's understanding of the technical support tasks required to meet the [Performance Work Statement] requirements" and that the task understanding narrative will be assessed to determine "the degree to which [the quoter's] approach satisfies the core task requirements in the [Performance Work Statement]").  Because the mitigation plan requirement appears in the Performance Work Statement under the "background" heading--not in the "description of required tasks," see AR 63, 65-67 (Performance Work Statement) (capitalization and emphasis omitted)--the court concludes that the RFQ did not require an offeror to include its mitigation plan, if one were required, in its task understanding narrative, cf. AR 48 (RFQ).

The court therefore finds that plaintiff's contention--that any mitigation plan was to be included in an offeror's Volume 1 Technical Quote--is not supported by the record. Because the court finds that the mitigation plan was not to be submitted as part of Volume 1, the court concludes that the mitigation plan was not subject to the Volume 1 page limitation.  Cf. AR 106 (Q&A) ("All information submitted as a part of Volume I is subject to the page limitation.")  Plaintiff's allegation that GSA unfairly increased the number of pages available to Forgentum for its technical quote is, therefore, without merit.

34

b.      With Respect to the Technical Evaluation

Plaintiff also contends that the GSA evaluators afforded Forgentum special treatment in their evaluation of Forgentum's technical quote.  Specifically, plaintiff claims that Forgentum's quote was improperly credited because Forgentum "did not disclose any knowledge or understanding of [Performance Work Statement] requirements . . . or experience independent of [***]."  Pl.'s Mem. 27; see also Compl. ¶¶ 123-24 (similar).  Plaintiff also claims that Forgentum was given "extra credit" for its understanding of the Remedy Management Tool but that, despite McVey's "extensive experience with the tool," McVey received "no credit at all for its understanding."  Pl.'s Mem. 28; see also Compl. ¶¶ 126, 129 (similar).  Similarly, McVey further claims that Forgentum was credited with "an in-depth knowledge of the [clinical data repository] Synchronization Server # 2, and issues surrounding it," but that McVey's "extensive experience using and understanding of the [server] . . . received no positive mention."  Pl.'s Mem. 28 (internal quotation marks omitted); see also Compl. ¶¶ 127-29 (similar).

Defendant responds that "GSA made a determination as to McVey's and Forgentum's task understanding that reflected [GSA's] reasonable consideration of the thorough documentation provided."  Def.'s Mot. 41.  Specifically, defendant states that McVey was credited "with an incumbent's knowledge" and was acknowledged as having an understanding of the Remedy tool, but was criticized for its failure to provide specific details related to task management and for its failure to offer new solutions.  Id. at 41-42.  Defendant asserts that, "[a]lthough McVey ultimately disagrees with GSA's evaluations of McVey's and Forgentum's task understandings, there is nothing arbitrary or capricious about the evaluation process and results."  Id. at 40 (internal citation omitted).

The test for the court in reviewing a challenge to a best value evaluation is whether the evaluation "was reasonable and consistent with the evaluation criteria and applicable statutes and regulations, since the relative merit of competing proposals is primarily a matter of administrative discretion."  E.W. Bliss Co., 77 F.3d at 449 (internal quotation marks omitted); accord Galen Med. Assocs., Inc., 369 F.3d at 1330.  The court is particularly deferential to an agency's technical evaluation, L-3 EOTech, 87 Fed. Cl. at 664; Fort Carson, 71 Fed. Cl. at 586, and the plaintiff's burden is elevated in a best value procurement, Blackwater, 86 Fed. Cl. at 503; see also Banknote, 365 F.3d at 1355 (discussing the particularly high level of discretion afforded a contracting officer under the best value evaluation standard).

With respect to plaintiff's allegations that Forgentum's quote received improper credit, and in particular, plaintiff's allegation that Forgentum was improperly credited because it "did not disclose any knowledge or understanding of [Performance Work Statement] requirements . . . or experience independent of [***]," Pl.'s Mem. 27; see also Compl. ¶¶ 123-24 (similar), the court notes that the government recognized as a negative aspect of Forgentum's Volume 1 Technical Quote that "the experience between the

[Forgentum and [***]] team is indistinguishable and introduces risk where the Government cannot determine experience of Forgentum as the prime," AR 200 (GSA award memorandum); accord AR 187 (technical evaluation summary).  However, the evaluators determined that the risk was mitigated by the benefits afforded by the quality of the experience.  AR 200 (GSA award memorandum).  Given the court's high degree of deference to an agency's technical evaluation, see L-3 EOTech, 87 Fed. Cl. at 664; Fort Carson, 71 Fed. Cl. at 586, the court cannot conclude that GSA's willingness to accept the risk of the "indistinguishable" experience was unreasonable or inconsistent with the evaluation criteria or applicable law, cf. Galen Med. Assocs., Inc., 369 F.3d at 1330; E.W. Bliss Co., 77 F.3d at 449.

With respect to plaintiff's allegation that Forgentum was improperly credited for its understanding and experience with the Remedy tool and the clinical data repository synchronization server #2, while McVey was not credited for similar experience, see Pl.'s Mem. 28; see also Compl. ¶¶ 126-29 (similar), the court again finds plaintiff's allegation without merit.  First, with respect to Remedy, both Forgentum and McVey discussed their experience with Remedy in their Volume 1 Technical Quotes.  See AR 121, 126-27 (McVey Vol. 1 Technical Quote) (describing Remedy experience); AR 154 (Forgentum Vol. 1 Technical Quote) (same).  GSA technical evaluators specifically recognized Forgentum's Remedy experience in their evaluation.  See AR 188 (technical evaluation summary) ("Forgentum has knowledge and experience with the Remedy tool, which is the core tool to support this task.").  The technical evaluators did not specifically reference Remedy in praising McVey for its "deep level of understanding of the support required," id. at 194, but the support praised by the technical evaluators would necessarily include Remedy, cf. id. at 188 (describing Remedy as "the core tool to support this task").  Further, the evaluators recognized that McVey proposed to "[s]hare Remedy knowledge by providing training."  Id. at 195.  Therefore, it appears that each offeror was credited for understanding and experience related to Remedy.

With respect to the clinical data repository synchronization server #2, although McVey's Volume 1 Technical Quote references the clinical data repository throughout, nowhere does it mention the synchronization server #2, specifically.  See AR 115-29 (McVey Vol. 1 Technical Quote).  Forgentum, in comparison, specifically described in its Volume 1 Technical Quote how transactions sent to the clinical data repository synchronization server #2 are typically processed and posted to the clinical data repository.  See AR 158 (Forgentum Vol. 1 Technical Quote).  Further, Forgentum explained how, [***].  Id. (internal quotation marks omitted).  The difference in the information provided by the offerors is accurately reflected in the GSA technical evaluation summary.  With respect to McVey, the technical evaluation summary notes that McVey "states that they have knowledge and understanding of the current processes but does not communicate any specific details."  AR 194 (technical evaluation summary).  Regarding Forgentum, the evaluators praised Forgentum's "in-depth understanding" of the server and related issues and stated that "[t]his demonstrated knowledge and

understanding is a benefit because the . . . server acts as the external interface to the clinical data repository . . . and knowledge of the [server] to facilitate execution of data reconciliation activities" was a required task under the Performance Work Statement.  Id. at 186 (emphasis omitted).

Given the court's high degree of deference to an agency's technical evaluation, see L-3 EOTech, 87 Fed. Cl. at 664; Fort Carson, 71 Fed. Cl. at 586, the court cannot conclude that GSA's evaluation with respect to the Remedy tool or the clinical data repository synchronization server #2 was unreasonable or inconsistent with the evaluation criteria and applicable statutes and regulations, cf. Galen Med. Assocs., Inc., 369 F.3d at 1330; E.W. Bliss Co., 77 F.3d at 449.  Even if plaintiff were correct that it should have received more credit for its experience with Remedy and the server, it likely could not establish prejudice on this point because--even if plaintiff should have been ranked slightly higher than Forgentum on the technical evaluation--both contractors were determined by GSA evaluators to meet the requirements, see AR 185 (technical evaluation summary), and the contracting officer would still be within her discretion to determine that McVey's technical merits did not warrant the higher price premium, cf. E.W. Bliss Co., 77 F.3d at 449 (stating that the "relative merit of competing proposals is primarily a matter of administrative discretion" (internal quotation marks omitted)); AR 47 (RFQ) ("[P]rice rises in importance when technical merit among the quotes becomes more equal.").

For the foregoing reasons, the court concludes that GSA did not fail to treat offerors impartially, fairly and equitably.  Cf. FAR 1.602-2(b) (requiring a contracting officer to "[e]nsure that contractors receive impartial, fair, and equitable treatment").

4.      Claim Four:  Failure to Follow Proper Evaluation Criteria

Plaintiff alleges that GSA "failed to conduct a proper best value determination in accordance with Solicitation requirements."  Pl.'s Mot. 1.  In support of this allegation, plaintiff states that "GSA disclosed to McVey that it awarded the contract to Forgentum on the basis of price," and argues that "GSA arbitrarily elevated the importance of price over the technical."  Pl.'s Mem. 29; see also Compl. ¶ 121 (similar).  Defendant responds that Ms. Stuart's determination that McVey's quote did not merit a higher price was "completely within GSA's discretion" in a best value solicitation.  Def.'s Mot. 40; see also id. at 3 (stating that GSA "had the discretion to weigh price and technical merit").  Defendant further states that, with respect to technical merit, because Forgentum was rated nearly the same as but slightly higher than McVey, "[i]t was . . . entirely consistent with the RFQ for GSA to . . . evaluate price."  Id. at 39-40.

Plaintiff's statement that "GSA disclosed to McVey that it awarded the contract to McVey on the basis of price," Pl.'s Mem. 29, is inaccurate.  Instead, Ms. Stuart explained to McVey that its quote was "determined to meet the Government's requirements under

each evaluation factor but did not merit the payment of a higher price."  AR 213 (October 15, 2012 e-mail from Ms. Stuart to McVey).

The RFQ described the weight of the evaluation factors as follows:  "both technical factors combined are significantly more important than price" and "price rises in importance when technical merit among the quotes becomes more equal."  AR 47 (RFQ).  Forgentum was rated slightly higher than McVey with respect to technical merit, AR 185 (technical evaluation summary), and Forgentum provided a price quote that was significantly lower than McVey's, see AR 205-06 (GSA award memorandum) (describing GSA's price evaluation).  Ms. Stuart's decision that McVey's lower-rated technical merit did not warrant payment of a higher price was entirely consistent with these evaluation factors.  Cf. AR 47 (RFQ).  Further, even if McVey had not been lower-rated with respect to its technical merit, the contracting officer would still be within her discretion to determine that McVey's technical merit did not warrant the higher price premium, cf. E.W. Bliss Co., 77 F.3d at 449 (stating that the "relative merit of competing proposals is primarily a matter of administrative discretion" (internal quotation marks omitted)); AR 47 (RFQ) ("[P]rice rises in importance when technical merit among the quotes becomes more equal.").

Plaintiff also alleges that GSA improperly evaluated Forgentum's past performance because, according to plaintiff, "[n]owhere in its evaluation criteria . . . did GSA disclose that it would accept a subcontractor's experience, exclusive of any consideration of the experience possessed by the prime contractor candidate."  Pl.'s Mem. 30; see also Compl. ¶ 136 (similar).  Plaintiff further alleges that "GSA's evaluators never assessed whether the subcontract Forgentum has with [***]," which it submitted as its past performance, "is 'similar in size and scope to the current requirement.'"  Pl.'s Mem. 31; accord Pl.'s Reply 26; see also Compl. ¶¶ 139-41 (similar).  Plaintiff bases this argument on the fact that the technical evaluation summary "says nothing about the quality of Forgentum's past performance or its similarity to the current contract work."  Pl.'s Reply 26; accord Pl.'s Mem. 31.  Instead, plaintiff claims, GSA evaluators merely contacted one of the references for the past performance project-- that is, the sustainment contract--and "confirmed that Forgentum was a subcontractor on [the sustainment contract]."  Pl.'s Mem. 31(internal quotation marks and emphasis omitted); see also Pl.'s Reply 26 (same).

Defendant responds that "the terms of the RFQ allowed GSA to consider Forgentum's performance as a subcontractor," Def.'s Mot. 4, and argues that GSA's inability to "completely separate out Forgentum's work [from [***]'s] does not make irrelevant or unusable Forgentum's success as part of a team," id. at 42; see also id. (arguing that plaintiff's assertion that Forgentum has little or no experience of its own apart from [***] is "unsupported by any record facts).  In addition, defendant alleges that McVey's allegations about GSA's past performance evaluation "misconstrue[] the record."  Def.'s Reply 10.  Specifically, defendant asserts that GSA's technical evaluation

summary "clearly stated that the contract, upon which Forgentum works as a
subcontractor, is similar in size and scope to the current requirements and that overall
performance upon the contract was noted as more than satisfactory." Id. at 10-11
(alteration and internal quotation marks omitted).

The RFQ stated that, with respect to past performance, each offeror was required
to provide one project "that is similar in size and scope to the current requirements" and
that "shall have been performed by the quoter within the past 3 years." AR 48 (RFQ)
(emphasis added). The RFQ explained that the past performance project "may have been
performed [by the quoter] []as either a prime contractor or subcontractor[]." Id.
(emphasis added). Therefore, the RFQ allowed Forgentum to submit as its past
performance example a project on which it was a subcontractor. Cf. id. The record
shows that Forgentum was, in fact, a subcontractor on the project it submitted as its past
performance example, the sustainment contract. See AR 188 (technical evaluation
summary) (stating that a reference "confirmed . . . that Forgentum was a subcontractor on
the current [sustainment contract]"); see also AR 160-61 (Forgentum Vol. 1 Technical
Quote) (describing past performance). Forgentum's past performance submission
therefore complied with the requirements of the RFQ. Cf. AR 48 (RFQ).

However, plaintiff does not appear to contest Forgentum's past performance
submission on the basis that Forgentum was a subcontractor on the project submitted;
instead, plaintiff appears to contest Forgentum's past performance submission on the
basis that Forgentum's particular experience with respect to the project could not be
separated from that of [***], the prime contractor on the project submitted. Cf. Pl.'s
Mem. 30 ("Nowhere in its evaluation criteria . . . did GSA disclose that it would accept a
subcontractor's experience, exclusive of any consideration of the experience possessed
by the prime contractor candidate."); Compl. ¶ 136 (similar). Plaintiff is correct that the
past performance section of the technical evaluation summary credits Forgentum for the
experience described--without attempting to separate Forgentum's particular performance
from that of [***], see AR 188-89 (technical evaluation summary) (describing past
performance evaluation)--even though Forgentum's past performance submission
described the experience of the "Forgentum Team with their [***] partner," AR 160-61
(Forgentum Vol. 1 Technical Quote). However, the RFQ contains no requirement that
the performance of the quoter, if a subcontractor, must be entirely distinguishable from
the performance of the prime contractor. Cf. AR 48 (RFQ) (stating only that the past
performance example "shall have been performed by the quoter [as either a prime
contractor or subcontractor] within the past 3 years").

Further, the contracting officer determined that any risk of being unable to
distinguish Forgentum's particular performance was mitigated by the benefits afforded by
the quality of the Forgentum and [***]'s collective experience. AR 200 (GSA award
memorandum) ("[T]he collective experience gained aligns with the support requirements
and provides expertise in relevant areas of the [Performance Work Statement sections

regarding task management and direct support tasks].  In addition, [Forgentum and [***]] have experience supporting the current Tier III contractor with scripts used for patient merge and unmerge.  This is considered a benefit to the Government in reducing performance risk, as Forgentum has a full understanding of the current environment in [its] role [with [***]] as a developer of the current applications.").  The record shows that GSA was fully aware that Forgentum's particular experience was "indistinguishable" from that of [***], AR 187 (technical evaluation summary); accord AR 200 (GSA award memorandum), and GSA evaluators specifically noted in the technical evaluation summary that Forgentum's "quote reference[d] all experience under "Forgentum Team[,] which includes the larger company, [***]."  AR 187 (technical evaluation summary).  Given the court's high degree of deference to an agency's technical evaluation, see L-3 EOTech, 87 Fed. Cl. at 664; Fort Carson, 71 Fed. Cl. at 586, the court cannot conclude that GSA's willingness to accept the risk of the "indistinguishable" experience with respect to Forgentum's past performance was unreasonable or inconsistent with the evaluation criteria or applicable law, cf. Galen Med. Assocs., Inc., 369 F.3d at 1330; E.W. Bliss Co., 77 F.3d at 449.

Plaintiff's allegation is also unfounded that, with respect to Forgentum's past performance submission, GSA never assessed the quality of Forgentum's experience or its similarity to the current requirements.  Pl.'s Mem. 31; Pl.'s Reply 26; Compl. ¶¶ 139-41.  The record shows that the technical evaluators concluded that the scope of the sustainment contract submitted by Forgentum as its past performance example was "similar in size and scope" to the contract at issue.  See AR 188 (technical evaluation summary).  Specifically, the evaluators noted that the sustainment contract required "[s]oftware development, help[]desk support, engineering recommendations, tiger teams to sort site issues, protection of [Department of Defense] Health Beneficiaries['] electronic information privacy, and a multitude of concurrent ongoing project/programs management."  Id.  The evaluators concluded that "[t]he submitted past performance is directly relevant as it involves help desk and software fixes of those systems identified in the current [Performance Work Statement]."  Id. at 189.

Similarly, the record shows that GSA specifically evaluated the quality of Forgentum's past performance submission.  According to the technical evaluation summary, the past performance reference "provided excellent performance ratings for Forgentum/[***][,] giving them a 4.5 out of 5 on quality performance."  Id. at 188.  The evaluators also stated that the reference described Forgentum as "provid[ing] quality deliverables well within the government['] required timelines with rare need for redos."  Id. (internal quotation marks omitted).  However, the technical summary evaluation also reports that the reference noted two weaknesses in Forgentum's performance:  that Forgentum "at times was delayed in updating the integrated master schedule" and that Forgentum "made a decision to combine high priority fixes with low priority fixes, which resulted in [a] complicated and lengthened [government] testing process."  Id. at 188-89.

Nevertheless, the reference described the "overall performance . . . as more than satisfactory." Id. at 189.

Based on the Administrative Record, the court cannot conclude that GSA's evaluation of Forgentum's past performance was unreasonable or inconsistent with the evaluation criteria or applicable law.  Cf. Galen Med. Assocs., Inc., 369 F.3d at 1330 (stating that the court will review an agency's best value evaluation to ensure that it was reasonable and in compliance with the evaluation criteria and applicable law); E.W. Bliss Co., 77 F.3d at 449 (same).

IV.    Conclusion

Plaintiff has failed to demonstrate that the government erred in awarding the contract at issue to Forgentum.  See supra Parts III.B.1.a (finding lack of error with respect to organizational conflict of interest evaluation), III.B.2 (finding lack of error with respect to mitigation plan evaluation), III.B.3 (finding lack of error with respect to equal treatment of offerors), III.B.4 (finding lack of error with respect to adherence to evaluation criteria); cf. Bannum, Inc., 404 F.3d at 1351 (stating that, to prevail in a bid protest, a plaintiff must first demonstrate error by showing that the agency acted in an arbitrary and capricious manner, without a rational basis or contrary to law).  Therefore, plaintiff cannot establish prejudice.  Cf. Alfa Laval, 175 F.3d at 1367 (stating that to prevail in a bid protest, a plaintiff must demonstrate both that an error occurred and that the error was prejudicial); Data Gen. Corp., 78 F.3d at 1562 (same); supra Parts III.B.1.b (finding that, even if plaintiff could establish error with respect to GSA's pre-award conflict of interest evaluation, plaintiff could not establish prejudice because the GSA corrective action remedied any defects), III.B.3.b (stating that, even if GSA should have given McVey more credit for its technical merits, plaintiff would be unlikely to establish prejudice given the contracting officer's discretion in a best value determination).  Accordingly, plaintiff is not entitled to relief.

For the foregoing reasons, defendant's Motion and Forgentum's Motion are GRANTED.  Plaintiff's Motion is DENIED.  The Clerk of Court shall enter judgment for defendant.  No costs.

IT IS SO ORDERED.

s/ Emily C. Hewitt
EMILY C. HEWITT
Chief Judge